549 A.2d 531

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Ronald LOGAN, Appellant.**

Supreme Court of Pennsylvania.

Argued Dec. 7, 1987.

Decided Oct. 18, 1988.

608

610

Michael E. Floyd, for appellant.

Gaele McLaughlin Barthold, Deputy Dist. Atty., Ronald Eisenberg, Chief, Appeals Div., Donna G. Zucker, Robert A. Graci, Chief Deputy Attys. Gen., Philadelphia, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA and PAPADAKOS, JJ.

## OPINION ANNOUNCING THE JUDGMENT OF THE COURT

PAPADAKOS, Justice.

The Appellant was convicted by a jury of murder of the first degree and possession of an instrument of crime for axing to death a stranger on a public bus containing five other passengers and was sentenced to death.

The record indicates that he delivered approximately fifteen blows to the victim's head. Testifying that "voices" directed him to act, the Appellant also claimed to have been motivated by some alleged verbal provocation on the part of the victim. An armed security guard, who was a passenger on the bus, drew his weapon and pointed it at the attacker to prevent him from fleeing. Upon being subdued by armed police who arrived quickly at the scene, he was given an abbreviated rendition of *Miranda* warnings but nevertheless blurted out that "I did it; I'm glad I did it; I will get ten years for it but I hope he dies." An autopsy revealed that the victim's fingers and hands had been mutilated in the defensive act of covering his head. The Appellant was read the *Miranda* warnings formally at police headquarters after which he confessed once again in writing to the killing. He was twenty-one years old at this time.

Following his arrest and during trial, the Appellant was confined to mental hospitals under authority of the Mental Health Procedures Act, 50 P.S. § 7305 et seq. Because of prior mental illness, he also had been institutionalized as a patient before the killing. He was medicated during all legal proceedings against him. Two court hearings concluded that he was competent to stand trial. His attorney was not permitted to withdraw from the case despite testimony that the Appellant expressed a wish to be executed and that he did not want to be defended. In the midst of these proceedings, the Appellant also threatened witnesses, the prosecutor, and the jury in open court.

He was defended unsuccessfully on the grounds of insanity under the *M'Naghten* rule and inability to form the specific intent required for murder of the first degree. Under *Regina v. M'Naghten,* 10 Cl. and Fin. 200, 8 Fug. Rep. 718 (1843), insanity is a defense if the defendant, at the time of the act, was suffering from "such a defect of reason, a disease of the mind, as not to know the nature and quality of his act or, if he did know it, as not to know that what he was doing was wrong." This is the statutory language of 18 Pa.C.S.A. § 315(b). The *M'Naghten* Rule is

preserved specifically under § 314(d). He was found guilty of that murder and of possession of an instrument of crime. At the penalty stage, the Appellant instructed his defense counsel not to plead any mitigating circumstances. The penalty jury then found two aggravating circumstances under 42 Pa.C.S. § 9711(d)(7), "grave risk of death" to others, and (d)(8), torture, but no mitigating circumstances. He was sentenced to death for murder and to a concurrent term of imprisonment of one to two years for possession of an instrument of crime.

Following our mandatory review pursuant to 42 Pa.C.S.A. § 9711(h)(1), we conclude that the facts do not justify a finding of the aggravating circumstance of torture. We affirm the sentence in all other respects under 42 Pa.C.S.A. § 9711(c)(1)(iv) which provides that "the verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance specified in subsection (d) and no mitigating circumstances or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances."

This appeal is based on the following allegations of error:

### I. *Suppression of Inculpatory Statements and Confession*

Appellant's first argument is that his inculpatory statements to the police should have been suppressed because they were the product of a defective mental condition, and, therefore, his *Miranda* rights against self-incrimination could not have been waived by him either at the scene or at the police headquarters in a knowing, understanding, and intelligent manner. In addition, the Appellant maintains that the first *Miranda* warnings rendered by the police at the scene of the crime were not given immediately and were so abbreviated in content as to induce him to utter words of confession.

The Appellant was advised of his *Miranda* rights on two occasions during the night of the killing:

### a. On the Bus.

Having been drawn to the carnage by a panic-stricken passenger, two police officers sped to the bus and entered with guns drawn. They observed the Appellant and the victim's body on the floor, they yelled "freeze" to the Appellant who quickly hid behind a seat. After approaching the Appellant who had stood up in a surrender posture, one officer directed him to lie on the floor and immediately straddled the Appellant between his legs. The second officer had left the bus hurriedly to talk to witnesses. Just prior to being handcuffed inside, the prisoner mumbled words to the straddling officer that he wanted to be shot, executed, and beaten. Handcuffs were applied, and at that point the officer quoted from several, but not all, of the *Miranda* rights:

Q. Now, when you called rescue, after you got back to the bus, did you give the defendant any information from any cards you had in your possession?

A. Also, yes, I did. Not from a card in my possession even though at all times I do possess a card with the Miranda warnings.

However, I didn't read the litany from the card. The defendant was on the floor at this time for my safety and Lieutenant Wilson's safety. Articles were taken from his possession.

Q. What were those articles?

A. A claw hammer was taken from Mr. Logan's outer coat pocket and a rubber mallet was taken from inside his coat pocket.

As the defendant was laying there from my memory I gave him a short explanation of his rights.

Q. Okay. Can you tell us as close as you possibly can what you told him?

A. I told him that he was under arrest. I told him he had a right to remain silent. Anything he can use— anything he says can be used against him in a court of law and that an attorney would be provided for him. I

was cut short or maybe that's not the proper term, cut short.

But—

Q. Were you able to finish the litany of rights?

A. No sir, I was not.

Q. Why were you not able to finish?

A. Mr. Logan was saying words to me that I just didn't understand what he was saying. It didn't seem that— I'm not saying—I'm just not—He just wasn't responding properly to what I was saying. (N.T., 2/5/82, pp. 42–43.)

Appellant was patted down. As noted in the testimony, a hammer and mallet were taken from his coat. Testimony at trial demonstrated also that Appellant seemed to be stating in somewhat garbled terms that he was "tired" of being provoked and that in prison he "was going to run the place." [1] As the Appellant was being led away through the bus, he blurted out that, "I did it; I'm glad I did it; I will get ten years for it but I hope he dies."

The arresting officer on the bus testified that in the clutch of those circumstances, he did not quote *Miranda* warnings immediately because he was engaged in the strenuous task of securing the Appellant in order to prevent harm to his own person, other officers, as well as to the prisoner himself. Other officers who had contact with the Appellant at the scene testified that they saw no evidence of the influence of drugs on the Appellant although he did appear to be excited. The officer who straddled and handcuffed the Appellant on the bus also stated on the record at trial that he had not engaged in any interrogation and had not asked the Appellant if the quoted *Miranda* warnings were being understood.

### b. At Police Headquarters

Uncontested police testimony shows that the Appellant was taken to the interview room of the Police Administra-

---

1. Appellant's exact words contain several expletives which are omitted herein.

tion Building where he was read *Miranda* rights from the Standard Police Interrogation Card. Appellant orally indicated at that time that he understood each warning and even asked for clarifications. He then gave a confession which was written out by the interviewing officer who reduced it to typewritten form. Appellant read his typed confession aloud into a tape recorder and signed each page. Prior to giving this confession, he was advised again of the *Miranda* rights. The Appellant apprised the interviewing officer of the fact that he could read and write English because he had gone to the eleventh grade in school. He also denied any recent use of drugs except for a "reefer" which he had smoked several days before the crime. There was no evidence that the Appellant had been coerced or induced by the police into making the confession.

Appellant instantly claims that his mental illness, existing at the time he confessed, precluded any ability on his part to waive his rights in a knowing, voluntary, and intelligent manner. His inculpatory statements, he now claims, were involuntary *a fortiori*, and should have been suppressed. We disagree based on the recorded facts as well as the applicable law of this Commonwealth.

■ Our cases have held invariably that defendants with proven psychological defects are capable indeed of waiving their constitutional rights and giving voluntary confessions. See, *Commonwealth v. Tucker*, 461 Pa. 191, 335 A.2d 704 (1975); *Commonwealth v. Fogan*, 449 Pa. 552, 296 A.2d 755 (1972); *Commonwealth v. Abrams*, 443 Pa. 295, 278 A.2d 902 (1971); *Commonwealth v. Darden*, 441 Pa. 41, 271 A.2d 257 (1970), *cert. denied*, 401 U.S. 1004, 91 S.Ct. 1243, 28 L.Ed.2d 540 (1971); *Commonwealth v. Willman*, 434 Pa. 489, 255 A.2d 534 (1969); *Commonwealth ex rel. Joyner v. Brierley*, 429 Pa. 156, 239 A.2d 434 (1968). Our most recent decision to this effect is *Commonwealth v. Bracey*, 501 Pa. 356, at n. 7, 461 A.2d 775, at n. 7 (1983) in which "we note that a person with a mental illness including a

history of hallucinations and delusions may be capable of ·waiving her constitutional rights." [2]

■ The voluntariness standard of *Miranda* requires that the prosecution prove by a preponderance of the evidence that the waiver is knowing and intelligent. This requires a two-step analysis. First, the waiver must have been voluntary in the sense that it was an intentional choice made without any undue governmental pressure; and, second, that the waiver must have been made with a full comprehension of both the nature of the right being abandoned and the consequences of that choice. We employ a totality of circumstances test in reviewing the waiver. *Commonwealth v. Scarborough*, 491 Pa. 300, 312–313, 421 A.2d 147, 153 (1980). We are bound also by the suppression court's findings of fact if they are supported by competent evidence.

■ Under these facts, the confession at police headquarters was the product of a free, unconstrained, and rational choice of its maker. The Appellant was fully aware of the fact that the interrogation concerned an investigation

**2.** *Bracey* addressed the distinguishable issue of whether an admission may be involuntary if it flows from an internal compulsion to confess which is rooted in a mental disease. Even in that case, this Court held, there were no constitutional protections against the admissibility of such statements. Indeed, the suppression judge in *Bracey* ruled that the Appellee knew what she was doing in confessing despite evidence of her history of hallucinations. See, *Tucker, supra,* and *Commonwealth v. Neely*, 298 Pa. Superior Ct. 328, 444 A.2d 1199 (1982), which ruled in line with *Tucker* that a "defendant may be suffering from a mental illness and still be capable of waiving his constitutional rights." The fact that such illness distorts perceptions of reality does not establish per se that the waiver was defective. *Neely*, 298 Pa.Superior Ct. at 344, 444 A.2d at 1207.

Appellant herein also rests his allegation on *Commonwealth v. Cephus*, 361 Pa. Superior Ct. 160, 522 A.2d 63 (1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 495, 98 L.Ed.2d 494 (1987) which held that a defendant *who was known to the police* to be mentally ill did not knowingly and intelligently waive his constitutional rights, and suppression of a confession was correct. *Cephus* presently is being reviewed by the Supreme Court of the United States at Docket No. 87-648. See, 56 UNITED STATES LAW WEEK (December 8, 1987). In the case under consideration here, of course, the police had no knowledge of the Appellant's prior history of mental illness.

into the death of the victim, as required by *Commonwealth v. Dixon*, 475 Pa. 17, 22, 379 A.2d 553, 556 (1977). All other facts recited as part of the circumstances of this confession compel us to conclude that the Appellant waived his *Miranda* rights in full conformity with legal requirements. In the absence under our law of a per se rule that no waiver can be voluntary when made by a person who is mentally ill, we hold that the suppression court was correct. Despite his mental illness, the Appellant was aware of the nature of the right which he was surrendering and of the consequences of that choice. For these identical reasons, we reject the related allegation that counsel was ineffective for failing to employ psychiatric testimony at the suppression hearing to demonstrate that his mental illness prevented a proper waiver.

▇▇▇ As to the inculpatory utterances made on the bus, at the outset we observe that they were blurted out freely and were not the results of any interrogation. Obviously they were not delusional for the reason that the Appellant knew full well that he had killed a person, could go to prison, and clearly articulated his motive for the act. Nor is there any need to be concerned about the abbreviated nature of the *Miranda* rights given from memory by the officer who straddled the Appellant on the bus. Under the circumstances of trying to restrain a person who had just hacked away violently at a victim's head, we find full justification for the officer's conduct in attending to the immediate requirements of the safety and security of all parties at the scene.

A corollary contention is that defense counsel was ineffective for failing to challenge the adequacy of the abbreviated *Miranda* warnings given on the floor of the bus as well as failing to give them immediately upon subduing and straddling the Appellant. As part of this complaint, the Appellant argues that the Omnibus Pre–Trial Motion was stated in such broad terms as to dissipate any specific reference to these discrete problems.

The allegation is patently without merit. Faced with the bloody crisis of subduing an identified killer on a public bus justified fully the actions of the police in attending to the immediate demands of safety.[3]

## II. *Competency to Stand Trial*

Appellant's second allegation of error in this case is that he was incompetent to stand trial.

The record shows that following the hearings on the suppression motion, defense counsel requested an immediate competency hearing. Counsel informed the court at that time that his client was insisting on pleading guilty, demanding to be executed, and refusing to cooperate in the preparations for trial. Counsel also unsuccessfully requested that he be excused from the case for these reasons. The present allegation derives from this same set of demands that he be executed, threat of non-cooperation with his attorney, the fact that he had been earlier treated for mental disorders, that he remained hospitalized in the care of psychiatrists since his arrest, and that his behavior during trial which included outbursts of laughter, threats to witnesses and the prosecuting attorney, and a public threat to kill members of the jury. It is alleged in this appeal that, viewed in these aggregate behavior patterns, the Appellant should not have been tried because he was incompetent.

Two competency hearings were held by the court. Both times he was found to be competent to stand trial. Psychiatric testimony, of course, was crucial to these evaluations. Examining the Appellant on the eve of the trial, the court psychiatrist argued that he was incompetent to stand trial

---

3. We recognize that it is difficult, indeed, to generalize about this type of circumstance in relation to *Miranda* for the obvious reason that the immediate facts themselves often will determine the time when the warnings must be given. In the "public safety" exception to *Miranda* in *New York v. Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984), it was decided that the warnings need not precede some interrogation where the police must search for a weapon to head off potential danger. Here, of course, the facts indicate that the police did remove a hammer and mallet from the Appellant's person. More importantly, we point to the fact that no interrogation took place on the bus.

on that day but that a final decision on competency should be left to the specialist who was conducting the hospital treatment.[4] The treating psychiatrist, in turn, declared the Appellant to be competent because he knew the nature of the charges, the function of the court, possible penalties (including death sentences), and the purposes of the prosecutor and defense counsel. The defense psychiatrist, Dr. Gary M. Glass, on the other hand, testified that the Appellant was unable to "process what is in his own best interests." Pertinent testimony by the defense psychiatrist is as follows:

A. It is my professional understanding and my professional role that many of these people, the vast majority of these people are not making a rational choice free of emotional disorder about whether they can live or should live or should die. I think Ronald is in that situation right now. I believe he cannot make a rational choice about his own defense because at this point in time, he is seeing himself in a very depressed state and is choosing to act in very self-destructive ways.

Q. Well, Doctor, don't you—do you realize that the defendant doesn't have to put on any evidence, he doesn't have to do anything in this case, that he has no burden to produce any evidence. Do you understand that?

A. Yes, I do.

* * * * * *

Q. Doctor, is it your testimony that this defendant is unable to assist his attorney in his own defense?

* * * * * *

The witness: I think he is primarily incapable at this time of acting in his own behalf or processing what needs to be processed to make those decisions. (N.T., 2/22/82, pp. 27–28.)

4. The treating psychiatrist was Dr. Richard Swartzman, who was the in-patient medical director of the Psychiatric Unit of the Philadelphia Prison System. Dr. Swartzman testified that he had seen the patient on numerous occasions. At the trial court's request, Dr. Swartzman examined the Appellant shortly before the trial date and reported that he was cooperative and responsive.

At the conclusion of the expert testimony, the trial court held that the Appellant was competent to go to trial. In reaching this determination, the court underscored the distinction between an *incapacity* to assist in a defense and an *unwillingness* to do so. On this basis, it was held that the defense's own psychiatrist, in fact, characterized the Appellant's state of mind as falling into the latter category. Moreover, the court found that the Appellant had failed to meet his burden of proof of demonstrating incompetency by clear and convincing evidence as required by the Mental Health Act of 1976, 50 P.S. § 7403(a): "The moving party shall have the burden of establishing incompetency to proceed by clear and convincing evidence. The determination shall be made by the court." [5]

Our most recent decision on this subject is *Commonwealth v. Banks*, 513 Pa. 318, 521 A.2d 1 (1987): [6]

> The test to be applied in determining the legal sufficiency of [a defendant's] mental capacity to stand trial ... is ... his ability to comprehend his position as one accused of murder and to cooperate with his counsel in making a rational defense. See *Commonwealth v. Moon*, [383 Pa. 18, 117 A.2d 96 (1955)], and *Commonwealth ex rel. Hilberry v. Maroney*, [417 Pa. 534, 544, 207 A.2d 794, 799 (1965)]. Or stated another way, did he have sufficient ability at the pertinent time to consult with his lawyers with a reasonable degree of rational understanding and have a rational as well as factual understanding of the proceedings against him. See, *Dusky v. United States*, 362 U.S. 402 [80 S.Ct. 788, 4 L.Ed.2d 824] (1960). Otherwise, the proceedings would lack due process: *Bishop v. United States*, 350 U.S. 961 [76 S.Ct. 440, 100 L.Ed. 835] (1956).

The fact that a defendant raises a bizarre response to his counsel's strategy, or refuses to cooperate with that strate-

---

**5.** Prior to 1976, proof required only a preponderance of the evidence. *Commonwealth v. Kennedy*, 451 Pa. 483, 487, 305 A.2d 890, 892 (1973).

**6.** The quotation came from *Commonwealth v. Martinez*, 498 Pa. 387, 391, 446 A.2d 899, 901 (1982).

gy, or displays childish and threatening behavior at trial does not necessarily constitute legal incompetency. Under *Banks, supra*, 513 Pa. at 343, 521 A.2d at 13, *"The issue is the defendant's ability to cooperate and not whether he is actually cooperating."* (Italics in the original.) Under this rule, there is sufficient evidence to support the lower court's ruling on competency. In addition to psychiatric testimony, the record discloses that the Appellant helped to select jurors, and, as noted by the trial judge, his own statements on the witness stand even evinced a sufficient degree of rationality to enable him to recognize the existence of his own illness.[7] While admittedly he suffered from a mental illness, there are no facts which would lead an appellate court to decide that he did not understand to a clear and convincing degree the nature and function of a criminal trial. The determination of competency, lastly, rests in the sound discretion of the trial judge and can be disturbed only upon a showing of abuse of that discretion. *Banks, supra*, 513 Pa. at 341, 521 A.2d at 12, and cases cited therein. We agree with the lower court's decision that the Appellant was competent to stand trial but chose rationally not to assist in his own defense, and we reject appellate counsel's citation of error.

III. *Did the Trial Court Err in Directing Defense Counsel to Provide the Prosecution with a Report of a Defense Psychiatrist?*

■ The Appellant argues that the psychiatric report of his own expert, Dr. Gary M. Glass, dated February 17, 1982,

---

7. I have something to say now. I'm pleading guilty anyway. You know, I'm not really guilty of this, you know, incident. But I am.... because I really was, you know, at the time really tripping and whatnot like that. Really sick and whatnot.

But I'm pleading guilty anyway of all the charges I have been charged with. This killing that I have done will be repeated. My death is the only way to stop the same thing from happening again. I am unhappy with life and wish to die. So I'm not worried about anything that, you know, comes out of this or nothing like that. See, life imprisonment—I'll run the jail for real. That's no bullshit. Only reason I am not running it is because I'm on a lot of medication and as far as dying, that's something I want to do anyway. So, nothing at all. (N.T., 3/3/82, p. 24.)

should not have been subject to discovery by the Commonwealth under Pa.R.Crim.P. 305(C)(2)(a):

(2) Discretionary With the Court:

In all court cases, if the Commonwealth files a motion for pretrial discovery, the court may order the defendant subject to the defendant's rights against compulsory self-incrimination, to allow the attorney for the Commonwealth to inspect and copy or photograph any of the following requested items, upon a showing of materiality to the preparation of the Commonwealth's case and that the request is reasonable:

(a) results or reports of physical or mental examinations, and of scientific tests or experiments made in connection with the particular case, or copies thereof, within the possession or control of the defendant, which the defendant intends to introduce as evidence in chief, or which were prepared by a witness who the defendant intends to call at the trial, when the results or reports relate to the testimony of that witness, provided the defendant had requested and received discovery under paragraph B(1)(e);

The record of testimony indicates that on direct examination, Dr. Glass was limited to statements regarding the Appellant's general mental state at the time of the crime and whether the Appellant was mentally capable of forming a specific intent to kill. Defense counsel did not question the witness on the particular subject of insanity under *M'Naghten*. On cross-examination, however, the prosecution elicited testimony on both issues of the mental state required to form specific intent and insanity. Dr. Glass testified that he believed that while the Appellant was sane at the moment of the killing, specific intent was not present. Following cross-examination, the prosecution moved successfully over objection to obtain a copy of the expert's report.

The Appellant now insists that although the substance of the medical report itself does address specific intent as well as *M'Naghten*, the insanity issue was not brought out on

direct testimony. The report, therefore, could not relate to the expert's testimony and be subject to discovery as required by the statute. Once in possession of the report, the Appellant further argues, the Commonwealth could prejudice him by revealing to the jury that his own expert had bolstered the damaging oral testimony on insanity with an existing written statement which repudiated that very defense.

In rejecting the Appellant's contentions, we take special note of the fact that the psychiatric report was not introduced at trial. We conclude, in addition, that the expert's direct testimony of the Appellant's mental state regarding specific intent addressed the contents of the medical report.

The insanity defense had been put on the record earlier by the Appellant. Under any sensible analysis, the psychiatrist's statement ran in an indistinguishable manner to the issue of whether the Appellant was insane under *M'Naghten*. That is to say that the testimony regarding mental illness directly touched and concerned the insanity problem. It makes very little sense to draw non-existent distinctions from this evidence. By employing the phrase "may order," we conclude further that the statute empowers courts to use discretion in ordering discovery of such documents. In this context, the trial court did not abuse its discretion.[8]

The Appellant also claims ineffective assistance of counsel in a closely-related allegation. The defense had called Dr. Swartzman as a surrebuttal witness regarding diagnosis and treatment of the Appellant's mental illness. Again, the specific issue of insanity was not mentioned. The prosecution, nevertheless, was permitted to ask questions without objection on the subject of *M'Naghten*, and the Appellant instantly claims error by his silent defense counsel. Although we are reviewing a citation of ineffective assistance, the claim fails for the same reason as cited

8. See, *Commonwealth v. Petrino*, 332 Pa.Superior Ct. 13, 480 A.2d 1160 (1984), *cert. denied*, 471 U.S. 1069, 105 S.Ct. 2149, 85 L.Ed.2d 505 (1984). We denied allocatur on January 17, 1985, at Nos. 123 and 125 M.D. Allocatur Docket 1984.

above. Dr. Swartzman's testimony was bound up insepara-
bly with the insanity defense.

IV. *Insufficiency of Evidence*

The Appellant also claims that the Commonwealth failed
to prove beyond a reasonable doubt that he was sane at the
time of the murder, failed to prove in the same manner that
he had the requisite specific intent to kill, and, additionally,
that the jury's sentence itself was based on his threats to
the jury rather than on the evidence. Plainly all these
allegations of error are unfounded for the following rea-
sons:

a. The Insanity Issue.

Our cases are uniform in holding that in a trial
for murder, the Commonwealth must establish "that the
accused is of sound memory and discretion, knows right
from wrong and appreciates the nature and quality of his
act," i.e., sane under Pennsylvania *M'Naghten* standards.
*Commonwealth v. Weinstein*, 499 Pa. 106, 451 A.2d 1344
(1982). Moreover, our review is limited in the sense that
"Psychiatric testimony, like any other evidence, is for the
trier of fact to consider and to determine what weight it
should be given." *Commonwealth v. Roberts*, 496 Pa. 428,
435, 437 A.2d 948, 951 (1981); *Commonwealth v. Whitfield*,
475 Pa. 297, 302, 280 A.2d 362, 364–65 (1977); *Common-
wealth v. McCusker*, 448 Pa. 382, 292 A.2d 286 (1972).

With the exception of the Appellant's own statement on
the witness stand, all other testimony, including that of the
defense's psychiatrist, concluded that the Appellant under-
stood the nature of his act and knew that it was wrong.
His own words uttered as he was being led from the bus
affirm his sanity: "I did it; I'm glad I did it; I will get ten
years for it but I hope he dies." He likewise testified on his
own behalf that while he knew that he had killed a man, he
was driven to it by "voices":

Q. Did you think Mr. Tilson was a log?

A. No. I didn't think he was a log.

Q. After you struck him the first time, did you see any blood?

A. Uh-huh. Yeah.

Q. Why didn't you stop then?

A. Because the voices was still telling me to keep hitting him.

Q. Do you know you hit him about 15 times?

A. I don't think I hit him that much, though. I don't remember how many times exactly I hit him. I know I did it until the voices let up.

\* \* \* \* \* \*

Question: Do you understand that you killed a man tonight? Answer: Yeah. I understand and I'm glad. Now, did you tell the police that?

A. I probably did, yeah.

Q. Were the voices telling you to tell them that then?

A. Yeah, it was.

Q. Question: Were you trying to kill the guy when you hit him with the axe? Do you remember that question?

A. Yeah, I remember.

\* \* \* \* \* \*

Q. Do you remember the police giving you an opportunity to say what you had to say on the tape?

A. Yeah. I was doing a lot of singing and whatnot on that tape.

Q. You were?

A. Uh-huh.

Q. You didn't say on that tape anything about voices, did you?

A. No. I don't think so.

There was indeed adequate evidence from which to conclude that the Commonwealth had borne successfully its burden of proving the Appellant's sanity beyond a reasonable doubt.[9]

9. The Appellant also argues that because several lay witnesses testified to his history of mental illness, the Commonwealth cannot defend successfully its conclusion that proof of sanity was beyond a reason-

## b. The Specific Intent Issue

The Appellant urges us to conclude that his mental illness made it impossible for him to form specific intent, and, in the alternative, that the prosecution's evidence was insufficient to prove specific intent beyond a reasonable doubt as required by *Weinstein, supra*, 499 Pa. at 115, 451 A.2d at 1348.

We need not pause again for any lengthy review of our standing recognition that evidence of mental illness can be introduced in first degree murder cases in an effort to negate the specific intent to kill. Most recently, our law on this subject has been summarized in *Commonwealth v. Terry*, 513 Pa. 381, 521 A.2d 398 (1987). We agree, as well, that such evidence was admitted properly in that it dealt with the topic of cognitive functions necessary to formulate specific intent under the *Weinstein* test, *supra*, 499 Pa. at 114, 451 A.2d at 1347. The point at issue here, however, is whether the Commonwealth established the existence of specific intent beyond a reasonable doubt. On the record before us, we have determined that the Appellant's complaint is without merit.

 We concur with Dr. Richard Swartzman, the hospital psychiatrist, who testified that a "man certainly may be diagnosed as psychotic and remain a psychotic. That does not mean that he cannot form the intent to do something." We repeat that it does not follow from the mere existence of a personality disorder, therefore, that there has been an impairment of the cognitive functions necessary to form specific intent. *Terry, supra*, 513 Pa. at 396–397, 521 A.2d at 405–406. We ground our definition of specific intent in the last analysis on the "assumptions of law—rationality, free will, and choice." As a legal concept of specific intent for this crime, we mean that the killer plans and carries out the act to advance his own desire and that he knows the act will result in the death of another. *Weinstein, supra*, 499 Pa. at 117, 451 A.2d at 1349.

able doubt. Of course, such testimony is irrelevant to the *M'Naghten* Rule.

■ Expert testimony as to the existence of specific intent in this case comes down to the fact that with the lone exception of the Appellant's own psychiatrist, Dr. Gary M. Glass, all other medical testimony concluded that the intent to kill definitely was present. Additionally, we have the objective fact that the killer struck his victim approximately fifteen (15) times while brandishing his hatchet. As noted above, at the scene he exclaimed also that "I did it" and then proceeded to confess to the authorities that he had *intended* to kill the victim because he thought the victim was provoking him. Taken as a whole, such testimony is unambiguous and conclusive as to the existence of specific intent. The Commonwealth met its burden of proof. In viewing the evidence in light most favorable to the Commonwealth, we conclude that the jury was justified in disbelieving his defense. *Commonwealth v. Christy*, 511 Pa. 490, 515 A.2d 832 (1986), *cert. denied*, 481 U.S. 1059, 107 S.Ct. 2202, 95 L.Ed.2d 857 (1987).

c. The Extra–Evidentiary Basis of the Verdict

■ The Appellant insists that the jury's sentence was predicated on a fear that he would carry out his death threats against them rather than on the factual evidence. This allegation stems from the following statement made to the jury upon the customary invitation by the court as the jury prepared to deliberate his sentence: [10]

THE COURT: Mr. Tatum, I just want to state for the record that your client is—You can explain to your client that if he wishes to make a statement—

MR. TATUM: He does.

THE COURT: —He can do so.

MR. TATUM: He does.

THE COURT: All right.

(Pause)

THE DEFENDANT: I'll give you one chance to kill me. You better take it now because if I ever get out I'll kill everyone of you.... That's my statement.

10. Expletives have been deleted.

MR. TATUM: I just want to add one other thing. I am continuing to raise the question of this defendant's competency to be involved in this trial from the beginning to now.

THE COURT: It's—your objection is noted on the record and objection overruled.

I think that completes our proceeding here. The jury is now directed to return again to the jury room to decide on the sentence.

THE COURT CRIER: Everybody remain seated while the jury leaves the room.

(Whereupon, the jury returned to the deliberation room to deliberate on a sentence at 12:37 p.m.) (N.T., 3/6/82, pp. 18–19.)

Initially, we insist that the integrity of the jury system cannot allow a defendant to benefit from his own wrongs. In his opinion, the trial judge properly cited the legal maxim that a person cannot make his condition better by his own tort. To reward such conduct surely would amount to an affront to the judicial system by opening the door to all defendants who, facing a losing trial, would engage in similar conduct in anticipation of receiving relief. We emphasize in this appeal that the Appellant offers no independent proof beyond mere conclusions that the jury was swayed as a matter of fact. We are confronted, instead, with the circular argument that the sentence itself and the speed with which the jury arrived at a sentence (twenty-eight minutes) speak for themselves, i.e., the severe nature of the sentence can mean only that the jury was controlled by the threat and decided to eradicate its source in the interests of personal safety. That argument must fail. There is simply no reason advanced in this appeal to distrust the validity of the jury's finding. The jury was polled individually, and no evidence whatsoever exists to raise even the barest suspicion that the jury was motivated by such fear.

## V. *Ineffective Assistance of Counsel*

The Appellant raises four allegations of ineffectiveness of counsel at trial and at sentencing, three of which already have been disposed of in the above analysis. The remaining allegation of ineffectiveness of defense counsel concerns the failure of his attorney to plead mitigating circumstances to the penalty jury.

■ The record indicates that the Commonwealth introduced evidence of two aggravating circumstances, including testimony from a police witness. By contrast, the Appellant's counsel told the court that he would obey his client's instructions to remain silent and not plead mitigation. Pertinent testimony is as follows:

MR. KING: Your Honor, of the 7 aggravating circumstances, the Commonwealth will only seek to enter evidence on the record on 2 of the 7 aggravating circumstances.

THE COURT: And what numbers are they so I can bring it to the jury's attention?

MR. KING: They are number 7, in the commission of the offense, the defendant knowingly created a grave risk of death to another person in addition to the victim of the offense.

The other would be that the offense was committed by means of torture. Those would be the 2 that the Commonwealth will urge as aggravating circumstances and is prepared to offer evidence on.

THE COURT: Mr. Tatum.

MR. TATUM: Yes, sir. My client has instructed me to thank the jury and yourself for seeking—seeing that he dies. He has instructed me further that he does not want me to make any argument. I am going to abide by his request. I think the jury has heard enough anyway to determine whether there are mitigating circumstances or not.

In addition, I have asked the court to give me an opportunity to present other evidence on Monday. The Court has refused that request and I am not prepared and

especially since my client has instructed me not to make any defense in this matter, I will not.

THE COURT: Well, I'll proceed with reviewing all the circumstances. (N.T., 3/3/82, pp. 8–9.)

The Appellant insists that his counsel was derelict in not claiming mitigation based on the statutory factors of youth and mental illness. 42 Pa.C.S. § 9711(e)(2), (3), (4).

Obviously, the Appellant, present in the courtroom, was determined not to present any evidence, and counsel followed his instructions. In his above statement, however, counsel expressly told the jury to consider the aggregate trial evidence as they deliberated a sentence. That evidence surely was sufficient for the jury's purpose of considering mitigating circumstances, especially in light of the judge's recitation of the circumstances and guidance in their consideration:

Now, we come to the mitigating circumstances. These are circumstances which would tend to reduce the gravity of the offense. Mitigating circumstances shall include the following:

1. The defendant has no significant history of prior criminal convictions.

2. The defendant was under the influence of extreme mental or emotional disturbance. That is something that the jury can consider.

3. The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. That is certainly a matter for the jury to consider.

4. The age of the defendant at the time of the crime. I believe his age is somewhere around 21, 22 years old. That's something for the jury to consider.

5. The defendant acted under extreme duress. Although no such duress as to constitute a defense to prosecution under section—volume 18 of the Pennsylvania Consolidated Statutes, Section 309 relating to duress which I will read to you, or acted under the substantial domination of another person.

Under Section 309, duress is explained as follows:

It is a defense that the actor engaged in conduct charged to constitute an offense because he was coerced to do so by the use of or a threat to use unlawful force against his person or the person of another which a person of reasonable firmness in his situation would have been unable to resist.

And the defense provided by this section is unavailable if the actor recklessly placed himself in a situation in which it was probable that he would be subjected to duress. The defense is also unavailable if he were negligent in placing himself in such a situation whenever negligence suffices to establish culpability for the offense charged. In my opinion, we do not have that situation here.

6. That the victim was a participant in the defendant's homicidal conduct or consented to the homicidal acts. It does not appear to be that situation here.

7. The defendant's participation in the homicidal act was relatively minor. We do not have that situation.

8. Any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense.

Now, after—those are the facts for this jury—you're limited to in deciding death or life imprisonment. (N.T., 3/3/82, pp. 9–13.)

On this record, the fact that counsel obeyed instructions did not prevent the jury in any way from being informed of the details of mitigation and of its duty to find and weigh both aggravating and mitigating circumstances.[11] There was no error here.

## VI. *The Aggravating Circumstances*

The sentencing jury found two aggravating circumstances under 42 Pa.C.S. § 9711(d):

11. In *Commonwealth v. Albrecht*, 510 Pa. 603, 511 A.2d 764 (1986), we determined that a failure to incorporate the trial record into the penalty proceedings did not amount to ineffective assistance of counsel on the grounds the jury understood its duties.

7. In commission of the offense the defendant knowingly created a grave risk of death to another person in addition to the victim of the offense.

8. The offense was committed by means of torture. The facts of this case compel us to reverse the finding of (8), torture, but to affirm the finding of (7).

 Evidence of a grave risk of death to others abounds in the evidence of an axe-wielding killer who was engaged in a grizzly act on a public bus in the midst of other passengers. These passengers feared for their lives and rushed to the doors in order to escape from the threatening situation. One witness testified that, "I was shocked and almost stayed there, right? I ran to the front of the bus right here hollering to the driver to let me off, let me off." Another passenger stated: "I was a very frightened man seeing something like this. I didn't want to be attacked like that. I wanted to escape." The bus driver, when asked why he did not help the victim, responded that, "I was a little afraid. I'm sorry." (N.T., 2/24/82, p. 59.) In reviewing this testimony, we are guided by a sufficiency of evidence standard enunciated in *Commonwealth v. Stoyko*, 504 Pa. 455, 475 A.2d 714 (1984), in which we also rejected the argument that the defendant must *"knowingly"* (italics in the original) endanger others as a basis for this aggravating circumstance.

In recent years, we have ruled on several cases involving fact patterns which constituted sufficient evidence to support a finding under § 9711(d)(7). In *Commonwealth v. Griffin*, 511 Pa. 553, 515 A.2d 865 (1986), we did not disturb a sentence of death where the defendant had shot and killed a victim on a crowded college dance floor. Similarly, in *Commonwealth v. Albrecht, supra,* this particular aggravating circumstance was affirmed where the defendant had been convicted of the intentional killing of his wife by arson which also had claimed the lives of his daughter and mother. *Stoyko's, supra,* facts led to a finding of a grave risk of death to others where the defendant shot his victim in a car carrying other passengers.

636

■ On this evidence, it is obvious that the finding of this aggravating circumstance was justified in all respects. On the other hand, there are no objective facts which could be employed to justify a finding of torture. The Appellant's conduct was aimed at killing his victim outright. The fact that the victim sought to defend himself by putting his hands over his head is not proof of torture. Without any factual evidence to demonstrate torture, we decide, therefore, to reverse the penalty jury on the specific finding of the aggravating circumstance of torture under § 9711(d)(8). Under 42 Pa.C.S.A. § 9711(c)(1)(v), we affirm the death penalty where there is one aggravating circumstance but no mitigating circumstance.

■ Finally, under our statutory duty to review death cases to determine whether the imposed sentence of death is "excessive or disproportionate to the penalty imposed in similar cases," according to 42 Pa.C.S. § 9711(h)(3)(iii), we have conducted an evaluation of all convictions of murder of the first degree prosecuted under the Act of September 13, 1978, P.L. 756, No. 141, 42 Pa.C.S. § 9711. We have reviewed the data and information pertaining to similar cases that have been compiled by the Administrative Office of Pennsylvania Courts (AOPC) pursuant to this Court's directive as enumerated in *Commonwealth v. Frey*, 504 Pa. 428, 475 A.2d 700 (1984). We find that the sentence of death is not excessive or disproportionate to the penalty imposed in similar cases, 42 Pa.C.S. § 9711(h)(3)(iii). We also find that the evidence supports the finding of an aggravating circumstance specified in subsection (d), 42 Pa.C.S. § 9711(h)(3)(ii), and that the sentences were not the product of passion, prejudice or any other arbitrary factor, 42 Pa.C.S. § 9711(h)(3)(i).

For the foregoing reasons, we uphold the convictions and affirm the sentence of death based on the conviction for murder of the first degree and the sentence of imprisonment for possession of an instrument of crime.[12]

12. The Prothonotary of the Eastern District is directed to transmit the full and complete record of the trial, sentencing hearing, imposition

McDERMOTT, J., joins in this opinion and also files a concurring opinion in which LARSEN, J., joins.

FLAHERTY, J., concurs in the result.

NIX, C.J., files a dissenting opinion in which ZAPPALA, J., joins.

McDERMOTT, Justice, concurring.

I join in the opinion announcing the judgment of the Court, but write separately to express the following views.

There is no doubt that there are cases which upon their face are so bizarre, so alien to the ordinary, that they raise the question of whether a sane man would do them. However, the issue of when a person is sane as to be legally responsible is only part of the problem directly before us.

The first question is whether that issue can be fairly tried. That involves a determination of whether the person is competent to stand trial, so as to be able to assert and cooperate in a defense, whatever that defense may be. In determining that question a court cannot decide solely upon the conduct as alleged or conceded by the accused, i.e., that because the conduct itself outrages normal expectations the accused is incompetent to stand trial. There must be more than seeming bizarre methods; otherwise active criminal intent could be hidden simply by the method employed. Some evidence beyond the method employed must be presented, and one cannot avoid trial simply because they say they are insane or incompetent at the time of the crime.

A court may determine competency by observing the accused, ordering medical and psychiatric evaluation, or hearing the previous history and the present evaluation of medical experts offered by either side, none of which the court is required to accept or believe.

When the court has made a decision on competency we cannot differ with that finding because we would have found differently; nor are we in a position to evaluate the

of sentence, and review by this Court to the Governor. 42 Pa.C.S. § 9711(i).

accused or the witnesses who the court has accepted or rejected. Neither we, nor the court below, however, should determine competency solely because the methods employed are outrageous or bizarre. This of course cannot satisfy every differing view on what constitutes competency, but it is all we have on the preliminary question and its defects cut both ways.

The ultimate safeguard is that at trial fact finders are entitled to rule according to their own wisdom under all the facts. At trial the question is different; the issue there is whether the person is sane under the law, a consideration that includes the conduct itself as well as any other evidence offered. Hearing all, factfinders may choose to believe what they will, and decide that no sane person would do what was done, regardless of what any one says. They may also believe the accused was a sane person who chose bizarre or unusual methods to accomplish his own purposes. Unless there is more than the method employed by the accused they should hear the case and make the final decision.

LARSEN, J., joins in this opinion.

NIX, Chief Justice, dissenting.

Because of a profound mental defect, appellant has been convicted by a jury of murder in the first degree and sentenced to death without being accorded a fair trial. The record, replete with evidence of his self-destructive mental illness, stands as a mockery of our criminal justice system. I would reject the trial court's finding of mental competency, vacate the guilty verdict obviously born of appellant's mental illness, and remand for a new trial once appellant has attained the necessary lucidity for the just adjudication of his criminality.

Our system of criminal jurisprudence, founded as it is upon the belief that no man should be deprived of his life or liberty without first having been accorded the fair and impartial judgment of his peers, *see* Pa. Const. art. I § 9, should never be permitted to indulge a mentally ill defend-

ant, whether competent to stand trial or not, in the termination of his existence. Although the competency standard was designed to effectuate the constitutional principle of a fair trial, *see Pate v. Robinson*, 383 U.S. 375, 378, 86 S.Ct. 836, 838, 15 L.Ed.2d 815, 818 (1966); *Commonwealth v. Marshall*, 456 Pa. 313, 319, 318 A.2d 724, 727 (1974); *Commonwealth v. Bruno*, 435 Pa. 200, 205 n. 1, 255 A.2d 519, 522 n. 1 (1969), the rule was by no means meant to encompass the entire right of an individual to a just proceeding. Thus, even though a defendant has been adjudged competent under the statutory definition of that term, the court's duty is not at an end. Where defendant's mental illness continues through trial, the court must review the record of the proceedings to determine whether the accused has been accorded a fair trial.

Under this procedure, our analysis must begin with the question of whether the trial court erred in finding appellant competent to proceed on criminal charges. The standard for competency is found in section 402(a) of the Mental Health Procedures Act, 50 P.S. § 7402(a). It states that

Whenever a person who has been charged with a crime is found to be substantially unable to understand the nature or object of the proceedings against him or to participate and assist in his defense, he shall be deemed incompetent to be tried, convicted or sentenced so long as such incapacity continues.

This provision in essence codified the common law standard for incompetency first announced in *Commonwealth ex rel. Hilberry v. Maroney*, 424 Pa. 493, 495, 227 A.2d 159, 160 (1967), and employed by the Court up to its most recent decision in *Commonwealth v. Banks*, 513 Pa. 318, 340–341, 521 A.2d 1, 12 (1987).

[T]he test to be applied in determining the legal sufficiency of [a defendant's] mental capacity to stand trial ... is not the M'Naghten "right or wrong" test, but rather his ability to comprehend his position as one accused of murder and to cooperate with his counsel in making a rational defense. Or stated another way, did he have

sufficient ability at the pertinent time to consult with his lawyers with a reasonable degree of rational understanding, and have a rational as well as a factual understanding of the proceedings against him.

*Commonwealth ex rel. Hilberry v. Maroney,* 424 Pa. at 495, 227 A.2d at 160 (citations omitted).

*See also, Commonwealth v. Martinez,* 498 Pa. 387, 391, 446 A.2d 899, 901 (1982); *Commonwealth v. Higgins,* 492 Pa. 343, 349, 424 A.2d 1222, 1225 (1980), *cert. denied,* 452 U.S. 919, 101 S.Ct. 3057, 69 L.Ed.2d 424; *Commonwealth v. Tyson,* 485 Pa. 344, 349, 402 A.2d 995, 997 (1979); *Commonwealth v. Melton,* 465 Pa. 529, 534, 351 A.2d 221, 224 (1976); *Commonwealth v. Davis,* 459 Pa. 575, 577–578, 330 A.2d 847, 848 (1975).

The lower court in the instant matter accorded appellant two competency hearings, both of which resulted in a finding of mental competence under 50 P.S. § 7402(a). Appellant raises the argument on this direct appeal that the standard embodied in section 7402 should be applied in situations where, although able to comprehend the nature of the proceedings and to assist counsel in his defense, if he chose to do so, the defendant is unable to understand what is in his own best interest. In essence, what appellant is arguing is that, in some situations, an incompetent criminal defendant might be able to assist in his own defense, if he would so choose, *but be unable rationally to make that choice because of his mental defect.* The Commonwealth counters by arguing that this subjective evaluation does not speak to the question of competency and offers no insight into the defendant's ability to participate in and understand the proceedings against him.

Appellant's position is supported to a large extent by Dr. Gary M. Glass, a psychiatrist, who testified on behalf of appellant following numerous contacts with him. Following an examination of appellant one (1) day before the expert's testimony during the competency hearing and two (2) days before the actual start of trial, Dr. Glass diagnosed appellant as suffering from manic-depressive illness or bipolar

affective disorder. He testified that appellant was severely depressed and suicidal, and that appellant had attempted suicide in the past. He further testified, in questioning by court-appointed defense counsel:

Q: Is Ronald in his present status able to co-operate with me in the preparation of his defense?

A: No, I don't believe he can.

Q: Why is that?

A: Because he—while doctor Swartzman's report is true in part that he is able to understand the proceedings—and I agree with that. He is able to understand the roles of the varying people in the scenario and comprehend that. He does have a complete understanding of what the possible outcomes are.

On the other hand, he is not able to process for himself what is in his own best interests and at this point in time, given his depressive status, likely in any way possible to act against his own best interests rather than on behalf of that.

(N.T. 2/22/82, p. 19)

A: ... I do not believe that he is capable of cooperating except in one direction and that is against his own best wishes. We know very commonly that people when they are depressed often act or most often act in ways that maintain depression that are self-punitive, that are self-destructive in many ways and I believe that Ronald at this point in time cannot make a rational decision as to whether he wants to help himself or hurt himself. I think that—that is, his condition—has him predisposed to self destructive behavior.

(N.T. 2/22/82, p. 20)

On cross-examination, Dr. Glass again restated his opinion as to appellant's competency:

Q: You said you disagreed that he's mentally capable of cooperating with his attorney in assisting his defense if he chooses to.

A: What I said was that he is not free to make a rational and independent choice independent of his emo-

tional disturbance. He will do anything at this point. He will be highly co-operative with any process whether it be court, the streets or anyplace else that is destructive to him personally or in other ways. He is not free from his mental illness such that he can make a fully self determined decision.

(N.T. 2/22/82, p. 24)

Q: Now, you are saying that—you're not saying that he's not capable of assisting his attorney, are you?

A: I am saying that he is not capable of making an unemcumbered choice as to whether he wants to assist his attorney or not.

(N.T. 2/22/82, p. 25)

Immediately subsequent to this testimony, the lower court rendered its decision finding appellant competent to stand trial. It thus rejected the testimony of Dr. Glass in favor of that of Dr. Richard Swartzman, appellant's treating physician. Dr. Swartzman had previously submitted a report wherein he opined that appellant, despite his mental illness, was competent to stand trial.[1] At this point it was proper for the court to find appellant competent, and I would not fault the court for beginning the trial. A determination of competency is within the sound discretion of the trial court. *Commonwealth v. Banks*, 513 Pa. at 341, 521 A.2d at 12; *Commonwealth v. Hart*, 501 Pa. 174, 177, 460 A.2d 745, 747 (1983); *Commonwealth v. Ware*, 459 Pa. 334, 356, 329 A.2d 258, 269 (1974).

The error of that court which demands a reversal of appellant's conviction instead occurred in not declaring appellant incompetent, despite repeated requests by defense counsel, when during the course of trial it became apparent that appellant was unable to cooperate with his trial counsel and to act in a manner which might ultimately win his

1. A report by Dr. Gino Grasso, a court staff psychiatrist, was also presented to the court. Although Dr. Grasso stated, in his opinion, appellant was not competent to stand trial, he deferred final judgment on the issue to Dr. Swartzman.

acquittal.[2] This error has been compounded by the strict construction of the competency standard employed by the majority. Even if I were to adopt such an unjustifiable interpretation of section 402 of the Mental Health Procedures Act, and thus hold that appellant was competent to stand trial, I would further review the record with an eye toward determining whether appellant's mental illness, although not impeding his ability to comprehend the proceedings or to assist counsel, nevertheless deprived him of his constitutionally guaranteed right to a fair trial.

Notwithstanding the expert testimony, the sole evidence cited by the majority to support its affirmance of the competency finding was appellant's aiding in the selection of the jury empaneled in his case.[3] His actions during the lucid moments, however, do not negate the clear import of his bizarre behavior at other times before and during the trial. How this Court, after reviewing the entire record as we are required to do in all capital cases, *see Commonwealth v. Zettlemoyer*, 500 Pa. 16, 26 n. 3, 454 A.2d 937, 942 n. 3 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), can ignore the plethora of evidence which shows complete incompetency on the part of defendant, and the unfairness in permitting the adjudication of his fate while in a diseased mental state, is beyond my comprehension.

Appellant suffered from mental illness for at least two (2) years prior to the homicide. Appellant's father, Melvin

2. We have previously stated that actual facts, proven by positive evidence, are entitled to far more weight than opinion evidence, even that of experts. *Commonwealth v. Woodhouse*, 401 Pa. 242, 260, 164 A.2d 98, 108 (1960); *Commonwealth v. Lance*, 381 Pa. 293, 113 A.2d 290 (1955); *Commonwealth v. Patskin*, 375 Pa. 368, 100 A.2d 472 (1953). Thus, in judging the mental competency of the defendant, it was error for the trial court to place greater weight upon the pre-trial opinion of Dr. Swartzman than upon his own observation of defendant's conduct and statements during trial.

3. The majority also notes that the testimony of the defendant "evinced a sufficient degree of rationality to enable him to recognize the existence of his own illness," as if his ability to recognize that he is sick makes the sickness any less real. This proposition is clearly absurd.

Logan, testified that appellant was initially admitted for treatment to Misericordia Hospital in 1978 suffering from a nervous breakdown. He was subsequently admitted to the Philadelphia State Hospital, referred to as "the Byberry", sometime in 1979 for a period of eight to nine months. During his stay, appellant exhibited nervous behavior, such as "pacing the floor, not able to hold a conversation.... Most of the things he did was laugh and grin." (N.T. 3/1/82, p. 65). Appellant was released to the custody of his aunt, but was again hospitalized on October 16, 1980, this time at the Philadelphia Psychiatric Center. According to Dr. Seung Kim, appellant's treating psychiatrist at the Center, he was admitted with preliminary diagnoses of chronic schizophrenia, manic-depressive illness, and inadequate personality. Upon admission, he exhibited severe psychomotor agitation and fast, continuous talking to himself. Against medical advice, he was discharged on November 1, 1980, still suffering from schizoaffective disorder. (N.T. 3/4/82, pp. 6, 7, 11–13, 25). The discharge predated the homicide by only forty (40) days.

Appellant's conduct during and immediately subsequent to the homicide further evinced a diseased mind. The nature of the attack, an unprovoked, gruesome attack upon an unfamiliar victim which ended only after the weapon became imbedded in the victim's skull, indicated that the mental illness had not subsided but was prevalent. After police arrived and restrained appellant, he told police "execute me, shoot me, beat me, whatever you want to do." (N.T. 2/25/82, p. 17–18; 2/26/82, p. 30).

Following his arrest, appellant was placed in the Detention Center and was referred for psychiatric treatment within hours of his arrival. He was later admitted to the psychiatric unit of prison where he remained up until the time of his trial. Appellant's bizarre behavior continued throughout his stay, and included an attempt at suicide in September of 1981.

During trial, appellant repeatedly behaved inappropriately and indicated a complete inability to allow his fate to be

justly adjudicated. For example, in the middle of defense counsel's questioning of appellant, he stated, not in response to anything asked by his counsel:

[The Defendant:] I have something to say now. I'm pleading guilty anyway. You know, I'm not really guilty of this. You know, incident. But I am—because I really was, you know, at the time really tripping and whatnot like that. Really sick and whatnot.

But I'm pleading guilty anyway of all the charges I have been charged with. This killing that I have done will be repeated. My death is the only way to stop the same thing from happening again. I am unhappy with life and wish to die. So I'm not worried about anything that, you know, comes out of this or nothing like that. See, life imprisonment—I'll run the jail for real. That's no bullshit. Only reason I am not running it is because I'm on a lot of medication and as far as dying, that's something I want to do anyway. So, nothing at all. (N.T. 3/3/82, p. 24)

Also during his direct testimony, appellant responded, when asked about the identity of Lester Johnson, one of the passengers on the bus:

[Mr. Tatum:] Do you know who Mr. Johnson is?

[The Defendant:] Yeah, I know. The liar that pulled the pistol on me. I would have crashed him, too if he had pulled a pistol on me. He didn't pull a pistol on me. He knows better than that. I'll kill that mother fucker. (N.T. 3/3/82, p. 10)

Appellant's bizarre behavior was not limited to his own testimony. On the third day of trial, he made several outbursts during the testimony of Detective Lawrence Roantree which precipitated a reprimand of appellant by the court before the jury. (N.T. 2/25/88, pp. 97–98). Throughout the testimony of defense witness Roosevelt Dosier, appellant's grandfather, appellant laughed for no apparent reason, which prompted defense counsel to invoke his client to "shut up." (N.T. 3/1/88, pp. 91–94, 98). Defendant conducted himself in a similar fashion during the testimony

of Carla Morgan (N.T. 3/1/88, pp. 108, 111) and Clayton Martin (N.T. 3/1/88, p. 136, 138).

Even more revealing were appellant's outbursts during the sixth day of trial. In rebuttal to appellant's insanity defense, the Commonwealth called several witnesses who had observed appellant's behavior in confinement while court was in recess. Immediately following the testimony of one of these witnesses, Sheriff Ernest Hopkins, appellant shouted:

The Defendant: What the fuck you talking about. I ain't cool with that guy over there. I don't want to hear that kind of shit.

Lying son of a bitch. Talking that dummy—he don't speak to me, nothing. Talking bullshit.

(N.T. 3/4/82, p. 44)

During the testimony of Sergeant William Shaw, the following exchange between appellant and the trial judge occurred:

The Defendant: How in the fuck this mother fucker knows what's going on with me and my father? He ain't worth shit. Me and my father ain't cool either.

The Court: You will have to remain quiet while the witness is testifying.

The Defendant: He's talking shit. That's what he's doing.

The Court: Keep quiet, Mr. Logan.

Mr. King: Your honor, may I have a moment? The thought trend was broken.

The Defendant: Listening into my conversation and all that shit. How would you feel if he was watching while you were talking to your family?

The Court: You have to remain quiet, Mr. Logan.

(N.T. 3/4/82, p. 51)

Once Sergeant Shaw had been excused, the following transpired:

The Defendant: Fucker, listening to what I'm saying to my family. That's why I'll kill you, you mother fucking ass; get smart. Mother fucker.

The Court: Sheriff, come forward.

The Defendant: Smart ass mother fucker. What's he listening to what I'm saying to my father, when I'm on trial? How's that sound?

The Court: We'll recess for 5 minutes.

Mr. King: Thank you, Judge.

The Defendant: How does that sound?

(Jury leaving.)

The Defendant: I want to die anyway. That don't got nothing to do with it. I don't like that shit. Mother fucker. Me and my father ain't even cool. I don't give a fuck.

I want to die. I'll take you out, too. I'll hurt you, too.

The Court: Everybody else is free to leave the room also. I'm going to leave the room.

(Witness excused and jury left.)

(N.T. 3/4/82, p. 53–54)

The jury convicted appellant of all charges following a little over two hours of deliberation, obviously based to a large extent upon appellant's complete inability to conform his conduct to that appropriate in a trial setting. But that did not end appellant's misbehavior. Subsequent to the court crier announcing the verdict and the jury being polled, appellant exclaimed, "I will·kill that mother fuckers, too." (N.T. 3/6/82, p. 4). Similarly, when permitted to address the jury upon allocution, appellant stated:

The Defendant: I'll give you one chance to kill me. You better take it now because if I ever get out I'll kill everyone of you mother fuckers. That's my statement. Punk mother fuckers.

(N.T. 3/6/82, p. 18).

It is thus clear that appellant was not able to act in such a manner as to aid his cause. His bizarre behavior throughout trial did not indicate a man who sought to further his

own best interests. Instead, it evinced a man who viewed the trial as a means of hastening his demise. To cooperate with counsel would have hindered the attainment of that end. Were defendant able to choose that end of his own unaffected volition, I would have no qualms with the majority's resolution of this appeal. *See Commonwealth v. Appel,* 517 Pa. 529, 539 A.2d 780 (1988) (holding that a defendant could seek the death penalty where his choice was voluntary). But this certainly was not such a case. To permit the judicial system to now serve as a tool for allowing this defendant to attain his demented goal of self-annihilation is violative of the moral and legal dictates of our society which abhors suicide in any manner, even in cases of terminally ill persons whose death is viewed as merciful. Because appellant could not rationally choose to aid in his defense, I would find that appellant was not competent to stand trial in 1982 in this matter. Moreover, I would find that he had been completely deprived of his right to a fair trial because of his profound mental illness.

It has been argued in contradiction to this position that a competency standard which would take into consideration the inability of a defendant to fathom his own best interest would be unmanageable. I must disagree. The inability of a defendant to act in such a way as to further his best interest, like the two recognized areas of incompetency, can only be found where a qualified mental health expert has testified in an unequivocal manner to the existence of this defect. For this reason, it will be no easier for a defendant to delay the criminal proceedings against him because of this mental defect than because of his inability to understand the nature of the proceedings or to assist counsel. This standard will simply add an additional inquiry to those presently demanded of a trial court in determining competency. I do not believe this to be an excessive burden in light of the grave constitutional ramifications of trying a mentally incompetent defendant.

Moreover, I do not believe that this standard is so general that any disagreement between counsel and client as to how

to proceed at trial would necessitate a finding of incompetence. It can be said without argument that it is in the best interest of every man to live, and not to engage in conduct certain to bring about his own death. Although this proposition is general, I do not believe that that makes it impossible for a trial court to determine, during the course of the trial, that certain behavior on the part of the defendant would have no other effect than to assure him a sentence of death. Such was the case in the instant appeal. One cannot legitimately argue that appellant's repeated outbursts, strewn with profanity and threats of violence to witnesses and jurors, would bring about any other sentence but death. The fact that the jury deliberated only 28 minutes on whether to enter a sentence which would deprive a man of his very life is clear testament to this.

Additionally, it is contended that if we permit appellant's self-destructive allocution to serve as a basis for a finding of incompetence, we will be creating a device whereby any criminal defendant, faced with a certain verdict of guilty, can terminate the proceedings simply by threatening the jury and thus feigning incompetence. However, the credibility of a witness has always been in the province of the factfinder, see, e.g., Commonwealth v. Seese, 512 Pa. 439, 443, 517 A.2d 920, 922 (1986), and we should not presume this defendant's conduct contrived because some others' might be. Moreover, where the record is devoid of any indication of incompetency up to that point, including expert testimony from mental health professionals, the trial court could be certain that this sudden destructive behavior was a product of fabrication, and could rule accordingly. That is not the instant case. Appellant's threat to the jury was not an isolated incident, but was proceeded by a history of mental illness, numerous outbursts and instances of inappropriate behavior both during trial and at the time of arrest, a crime which manifested a very diseased mind, and the unequivocal testimony of a psychiatrist who had observed appellant on several occasions and predicted that this disruptive behavior would in fact occur.

Accordingly, I would reject the trial court's finding of competency as contrary to law, hold that appellant was denied a fair trial, vacate the conviction, and remand the case for a new trial once appellant has been properly adjudged competent to proceed to trial. *See, Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966).

ZAPPALA, J., joins in this opinion.