J-A28018-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| RICHARD M. DODDS | |
| Appellant | No. 287 EDA 2014 |

Appeal from the Judgment of Sentence of September 30, 2013
In the Court of Common Pleas of Philadelphia County
Criminal Division at No.: CP-51-CR-0014515-2010

BEFORE:  GANTMAN, P.J., WECHT, J., and JENKINS, J.

MEMORANDUM BY WECHT, J.:                    **FILED NOVEMBER 25, 2014**

Richard M. Dodds appeals the September 30, 2013 judgment of sentence entered by the Philadelphia County Court of Common Pleas.  We affirm.

The trial court summarized the factual history of the case as follows:

On October 31, 2010, Ian Hirst-Hermans ("Hirst-Hermans"), Justin Boylan ("Boylan"), Vincent Gasparo ("Gasparo"), and Christian Succecci ("Succecci") attended a party in the 2100 block of North 17th Street in the City and County of Philadelphia. All attended Temple University.  Before attending the party they visited other friends, and beginning at 8:00 p.m., along with Andres Choi ("Choi") and Austin Heron ("Heron"), they walked to Brian Jerome ("Jerome")'s house for the party.

After arriving, the group greeted friends.  Hirst-Hermans and Boylan also spoke with two girls they did not know, Shannon Bouvia ("Bouvia") and Anna Marczak ("Marczak"), who were in costume as "bunnies."  While they were downstairs, [Dodds] confronted Hirst-Hermans for talking to Bouvia, and Hirst-Hermans walked away.  At one point, Boylan noticed [Dodds] watching them intently from the opposite side of the kitchen.

Although he and Hirst-Hermans ignored [Dodds], the glares continued. Boylan asked Bouvia if she knew [Dodds], and she replied that he was her brother.

After about an hour, Boylan went upstairs with the girls. Bouvia admitted [Dodds] was her boyfriend, not her brother, and after that admission Boylan ceased talking to her. Boylan and Hirst-Hermans exchanged words with [Dodds] during the party. Boylan went back downstairs to visit with three or four friends in the kitchen. At least twenty minutes after he first saw [Dodds], Hirst-Hermans overheard him tell Bouvia that Boylan was a "douchebag." Hirst-Hermans told [Dodds] to shut up.

Choi and Hirst-Hermans observed [Dodds] by the door, muttering angrily. Seeing Hirst-Hermans was uneasy, Choi asked whether he wanted Choi to say something to [Dodds]. Choi then approached [Dodds] and they argued; Choi threw the first punch, hitting [Dodds] in the face, and [Dodds] fought back. The fight escalated to wrestling on the ground, and when Hirst-Hermans attempted to drag Choi away from [Dodds,] he was pulled down as well. [Dodds] punched Hirst-Hermans in the back as Hirst-Hermans held him in a bear hug. The fight lasted about fifteen seconds before other party guests broke it up.

[Dodds] was then asked to leave, and Boylan and his friends returned to the party. Boylan and Hirst-Hermans walked to the backyard to get a beer. Conflicting estimates put the time at either twenty minutes to half an hour. Eventually Hirst-Hermans wanted to leave, as Gasparo and Succecci had already left.

It was approximately 2:00 a.m. by the time Hirst-Hermans and Boylan left the house, walking up 17th Street towards Edgley Street. [Dodds] approached from around the corner, walking in a circle around them, and the three men came to a stop in the intersection. [Dodds] yelled, "You little fucking pussy; you don't want to fuck with me, you fucked with the wrong dude."

Hirst-Hermans exchanged "trash talk" with [Dodds] before he stopped and asked, "What are you doing, what's going on?" [Dodds] came to a halt about four or five feet in front of the two men, pointing a gun at Hirst-Hermans. Hirst-Hermans asked, with his arms held down by his thighs, "Are you going to shoot me?" [Dodds] then fired a single shot at Hirst-Hermans' chest.

Hirst-Hermans fell to the ground in the middle of the street, vomiting and bleeding heavily from his mouth and the right side

of his chest.  His eyes rolled up in his head and his face turned white.  Boylan, Jerome, Neil Tierney ("Tierney") and Heron ran to him and together turned Hirst-Hermans over.  Boylan called 911 while Heron and Tierney pressed down upon Hirst-Hermans' chest, trying futilely to stop the bleeding.  [Dodds] remained standing at the scene with the gun in his hand.

At around 2:00 a.m., Police Sergeant Miranda Cruz, responding to an unrelated back[-]up call, was driving southbound on 17th Street and noticed a large crowd of people gathered at 17th and Edgley Streets.  As she left her car to investigate, she saw [Dodds] walking towards her with a black handgun, his arms held straight out and pointing the gun at her chest.  [Dodds] told her that he had just shot a male, it was in self-defense, and he had a license to carry.  Sergeant Cruz ordered [Dodds] to drop the gun but he did not comply, and so she called for immediate assistance.  [Dodds] still did not drop the gun, though Sergeant Cruz ordered him to do so or she would shoot him.  The scene was chaotic with many witnesses yelling that [Dodds] had shot Hirst-Hermans.  By the time backup arrived, Sergeant Cruz stood over [Dodds] pointing her gun at him, with his own gun on the ground.  Officers approached [Dodds] and ordered him to put the gun down.  Officer Stephens secured the black Glock 19 with his foot then placed handcuffs on [Dodds] with the help of his partner, Officer Christopher Manigault.

* * *

At the hospital, emergency room staff cut off Hirst-Hermans' clothes and rushed him immediately into surgery, as he was in highly unstable condition with a high heart rate and low blood pressure.  He had lost at least 30% of his blood volume.  Doctors sutured a vein in his right arm closed to stop the bleeding.  A vein was removed from his leg to replace the shattered axillary artery in his right arm.  Hirst-Hermans remained in surgery for three hours.

Hirst-Hermans remained in the hospital for five days.  He attended physical therapy twice a week for a year, and did not regain mobility in his right arm until after a year.  Six weeks after leaving the hospital he could only twitch a finger.  To the present day, he has no skin sensation in his hand; a strip running from his hand down the back of his arm to his shoulder is completely numb.  He has difficulty playing the guitar, writing, opening objects, and dressing himself.  He was not able to

graduate college in four years; as a result of his injuries he was forced to take a medical leave.

Trial Court Opinion, 3/10/2014, at 3-7 (record citations and footnotes omitted).

The trial court summarized the procedural history of the case as follows:

On October 31, 2010, [Dodds] was arrested and charged with Attempted Murder of the First Degree, Aggravated Assault, [Possessing Instruments of Crime ("PIC")], Simple Assault, and Recklessly Endangering Another Person ("REAP").[1]

On July 10, 2013, this case proceeded to trial by jury on the charges of Attempted Murder, Aggravated Assault, and Possessing of an Instrument of Crime. The charges of Simple Assault and Recklessly Endangering Another Person were *nolle prossed*.

On July 19, 2013, the jury convicted [Dodds] of Aggravated Assault and PIC, and acquitted him of Attempted Murder. Sentencing was deferred to September 30, 2013, pending a Pre-Sentence Investigation and mental health report.

On September 30, 2013, [the trial court] sentenced [Dodds] to an aggregate sentence of ten (10) to twenty (20) years' incarceration.[2,3]

_____

[1]    18 Pa.C.S. §§ 901 (18 Pa.C.S. § 2503(a)), 2702, 907, 2701, and 2705, respectively.

[2]    For aggravated assault, the court sentenced Dodds to ten to twenty years' incarceration, which is the statutory maximum sentence for that offense. For PIC, the court imposed a concurrent sentence of two and one half to five years' incarceration.

[3]    Dodds undisputedly was subject to the mandatory minimum sentence provided in 42 Pa.C.S. § 9712(a), which requires the imposition of a

*(Footnote Continued Next Page)*

On October 7, 2013, [Dodds] filed a Post-Sentence Motion for Modification of Sentence with new counsel, alleging that [the trial court] exceeded the sentencing guidelines without justification.

On December 23, 2013, [Dodds] filed a Supplemental Post-Sentence Motion for a New Trial, alleging that trial counsel was ineffective for failing to request a jury charge of Defense of Others and for failing to object to a lack of a speedy trial [pursuant to] Pa.R.Crim.P. 600.

[Dodds'] motions were denied on January 21, 2014.

On January 28, 2014, [Dodds] filed a timely notice of appeal before the Superior Court of Pennsylvania.

On February 5, 2014, [the trial court] filed its Order Pursuant to Pa.R.A.P. 1925(b) directing [Dodds] to file a [c]oncise [s]tatement of [the errors] [c]omplained of on [a]ppeal within twenty-one days.

On February 20, 2014, [Dodds] filed [his Rule 1925(b) statement], alleging that [the trial court] abused its discretion in refusing to grant trial counsel's request that [Dodds] be re-evaluated for competency to stand trial, and that the sentence was excessive.

*Id.* at 1-2 (trial court's footnotes omitted). On March 10, 2014, the trial court entered an opinion pursuant to Pa.R.A.P. 1925(a).

Dodds raises the following two issues on appeal:

1. Did the lower court abuse its discretion in refusing to grant [Dodds'] attorney's request that [Dodds] be reassessed as to competency to stand trial?

2. Did the trial court abuse its discretion in imposing an excessive and unreasonable sentence upon the Appellant?

*(Footnote Continued)* ——————————

minimum sentence of five years' incarceration upon a defendant convicted of aggravated assault who used a firearm in connection with the crime.

Dodds' Brief at 3.

The test for determining whether a defendant is competent to stand trial is well-settled:

A defendant is presumed to be competent to stand trial. Thus, the burden is on the defendant to prove, by a preponderance of the evidence, that he was incompetent to stand trial. In order to prove that he was incompetent, the defendant must establish that he was either unable to understand the nature of the proceedings against him or unable to participate in his own defense.

Stated otherwise, the relevant question in a competency determination is whether the defendant has sufficient ability at the pertinent time to consult with counsel with a reasonable degree of rational understanding, and to have a rational as well as a factual understanding of the proceedings.

We extend great deference to the trial judge's determination as to competency because he or she had the opportunity to observe directly a defendant's behavior.

*Commonwealth v. Pruitt*, 951 A.2d 307, 316 (Pa. 2008) (internal citations, quotation marks, and brackets omitted; formatting modified). Whether a defendant is cooperating with counsel during trial is not at issue when determining competency; rather the relevant question is whether a defendant is **able** to cooperate with counsel during the trial. *Commonwealth v. Logan*, 549 A.2d 531, 539-40 (Pa. 1988). Further, mental illness does not by itself render a defendant incompetent. *See Commonwealth v. Chopak*, 615 A.2d 696, 699 (Pa. 1992).

In the present case, defense counsel, noting concerns regarding Dodds' behavior, requested a psychological examination on the second day

of the trial. Notes of Testimony ("N.T."), 7/11/2013, at 3-6. Specifically, defense counsel stated that Dodds' responses to his questions were "not appropriate."[4] *Id.* at 4-5. As a result, the trial court ordered a psychological examination. *Id.* at 15. The psychological examination revealed that Dodds was competent to stand trial, but, if necessary, should be evaluated on a daily basis. *Id.* at 14-15.

On July 12, 2011, defense counsel requested a second psychological examination for Dodds. N.T., 7/12/2013, at 3-4. The trial court, citing the fact that there was no visible change in Dodds' behavior since the previous day's psychological examination, denied the request. *Id.* at 4. Dodds made no further request for a psychological examination during the remainder of the trial.

On July 16, 2013, Dodds elected not to testify on his own behalf. N.T., 7/16/2013, at 140. At that point, Dodds was examined at length by both defense counsel and the trial court. *Id.* at 141-46. During the examination, Dodds indicated that he was not under the influence of any medication that affected his ability to make a decision on whether to testify. *Id.* at 141, 144. Dodds also indicated that he understood the role of the judge, jury, district attorney, and defense counsel at his trial. *Id.* at 141. Notably, the court asked Dodds whether he was taking medication for his mental illness.

---

[4] The record is silent as to how Dodds' responses were inappropriate. Conversations between Dodd and defense counsel were privileged.

Dodds indicated that he had been on medication but had not been taking it recently. The court asked whether that would "in any way interfere with [Dodds'] ability to make [his] decision to testify," and Dodds indicated that it did not. *Id.* at 144-45. Dodds then reiterated that he did not wish to testify. *Id.* at 145.

Dodds was deemed competent to be tried on day one of trial. On the second day, the trial court granted Dodds the opportunity to show that circumstances had changed overnight, such that he no longer was competent to stand trial. Dodds' counsel ventured nothing but vague and conclusory allusions to inappropriate answers to questions in their private discussion. Furthermore, Dodds did not request a reevaluation in the days that followed. Later in the trial, Dodds knowingly and intelligently declined to testify on his own behalf, and the record does not indicate that his behavior changed after he first was deemed competent to stand trial. This limited record is insufficient to establish that Dodds did not understand the nature of the proceedings against him or that he was unable to assist in his own defense. Therefore, Dodds' first issue does not warrant relief.

In his second issue, Dodds claims that the trial court imposed an excessive and unreasonable sentence. "A challenge to the discretionary aspects of a sentence must be considered a petition for permission to appeal, as the right to pursue such a claim is not absolute." *Commonwealth v. McAfee*, 849 A.2d 270, 274 (Pa. Super. 2004). To obtain review of the merits of a challenge to the discretionary aspects of a

particular sentence, an appellant must include the statement required by Pa.R.A.P. 2119(f) in his brief.[5]  Therein, "the appellant must show that there is a substantial question that the sentence imposed is not appropriate under the Sentencing Code." *McAfee*, 849 A.2d at 274.

To establish a substantial question, the appellant must articulate "the manner in which the sentence violates either a specific provision of the sentencing scheme set forth in the Sentencing Code or a particular fundamental norm underlying the sentencing process." *Commonwealth v. Tirado*, 870 A.2d 362, 365 (Pa. Super. 2005) (quoting *Commonwealth v. Mouzon*, 812 A.2d 617, 627 (Pa. 2002)).  A challenge to a sentence that exceeds the guidelines' recommended range but falls within the statutory limit may present a substantial question.  *See Commonwealth v. Hanson*, 856 A.2d 1254 (Pa. Super. 2004).  This Court's inquiry "must focus on the *reasons* for which the appeal is sought, in contrast to the *facts* underlying the appeal, which are necessary only to decide the appeal on the merits."

---

[5]     Rule 2119 provides, in relevant part, as follows:

> **Discretionary aspects of sentence.**   An appellant who challenges the discretionary aspects of a sentence in a criminal matter shall set forth in a separate section of the brief a concise statement of the reasons relied upon for allowance of appeal with respect to the discretionary aspects of a sentence.   The statement shall immediately precede the argument on the merits with respect to the discretionary aspects of the sentence.

Pa.R.A.P. 2119(f).

*Tirado*, 870 A.2d at 365 (quoting *Commonwealth v. Goggins*, 748 A.2d 721, 727 (Pa. Super. 2000) (*en banc*)).

Here, Dodds' brief contains the requisite Rule 2119(f) statement. Therein, he claims that the trial court imposed an unreasonable sentence, failed to consider mitigating factors such as Dodds' mental illness, and "concentrated almost exclusively on the injury to the victim." Dodds' Brief at 9. Notably, not only was Dodds' sentence well in excess of the aggravated range prescribed by the guidelines, the upper bound of which was sixty-six months, but it was equal to **twice** the mandatory minimum sentence. Therefore, Dodds has raised a substantial question, and we will review his sentence on its merits. *See Commonwealth v. Boyer*, 856 A.2d 149, 152 (Pa. Super. 2004) (finding a substantial question where appellant alleged that the court imposed statutory maximum sentence and discussed only the nature of the crimes committed in support of the sentence).

When sentencing a defendant outside either the mitigating or aggravating ranges of the Sentencing Guidelines, the trial court is required to indicate its awareness of the range suggested by the Sentencing Guidelines. *Mouzon*, 828 A.2d at 1128. After acknowledging the Sentencing Guidelines, the trial court may sentence a defendant outside the guidelines' aggravated range, provided that the court considers (1) the protection of the public; (2) the rehabilitative needs of the defendant; and (3) the gravity of the offense as it relates to the impact upon the life of the

victim and the community. ***Commonwealth v. Hill*** 66 A.3d 365, 370 (Pa. Super. 2013). When sentencing a defendant outside the guideline range, the trial court must state the factual basis and specific reasons for doing so on the record. ***Id.***

The trial court both acknowledged the range set by the Sentencing Guidelines and addressed the three factors required by ***Hill*** before he sentenced Dodds to the statutory maximum for his aggravated assault conviction. The trial court noted Dodds' prior record score of zero and indicated that the applicable standard range for the aggravated assault was thirty-six to fifty-four months, plus or minus twelve months in mitigation or aggravation. N.T. 9/30/2013 at 5. Thus the upper bound of the guidelines' aggravated range was only six months greater than the mandatory minimum five-year sentence that applied to Dodds.

To the contrary of Dodds' representations, the trial court addressed all three ***Hill*** factors, painting a clear picture of its basis for imposing a lengthy sentence. With regard to the protection of the public, upon which the trial court actually spent far more time than it did on any other factor, the court underscored the setting, a college party "where some young folks are gathering and drinking beer and having a party," and where "people generally [don't] think that they'll be shot at . . . while they are drinking from a keg." N.T., 9/30/2013, at 56-57. The court also noted that there was a gap between the first scuffle and the second nearly fatal confrontation of at least five and as many as forty minutes, a time period during which

Dodds might have left the area and avoided further trouble; the court speculated that Dodds might have lingered only because he was emboldened by his firearm. *Id.* at 58. The trial court noted "these [considerations] are all part of my concerns when I think about the protection of the community because you made . . . [a] decision in terms of exercising your discretion[;] . . you made a really bad decision and you exercised your discretion in a very poor way to the point where this young man was injured horribly and almost died." *Id.* The trial court also emphasized that were it not for a modicum of luck, such as it was, and the extraordinary efforts of the victims' friends and the responding officers, the victim very likely would have died. *Id.* The trial court concluded: "And so when I think about the protection of the community that is what—well, it's all processed and I have a grave concern about you being out in the community when you are exercising discretion in that manner." *Id.* The trial court also expressly considered what it perceived to be Dodds' rehabilitative needs, stressing the need for anger management classes and mental health treatment. And although the trial court did not spend many words on the gravity of the offense, *vis-à-vis* the impact upon the life of the victim, the court plainly considered it, and the record speaks for itself inasmuch as the victim came within a hair's breadth of bleeding out fatally and suffers continuing severe disabilities arising from his injuries.

Although the trial court exceeded the guidelines' aggravated range suggested by the Sentencing Guidelines, we find that the trial court provided

ample justification on the record for imposing a lengthy sentence upon Dodds. Therefore, the trial court did not abuse its discretion when it sentenced Dodds to the statutory maximum for aggravated assault.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/25/2014