J-S39020-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA  :   IN THE SUPERIOR COURT OF
                              :            PENNSYLVANIA
                              :
                   v.         :
                              :
                              :
                              :
JAMES BARROW                  :
                              :
              Appellant       :   No. 606 EDA 2019

Appeal from the Judgment of Sentence Entered October 1, 2018
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0003610-2016

BEFORE:   LAZARUS, J., OLSON, J., and PELLEGRINI, J.[*]

MEMORANDUM BY OLSON, J.:           **FILED SEPTEMBER 28, 2020**

Appellant, James Barrow, appeals from the judgment of sentence

entered on October 1, 2018, as made final by the denial of his post-sentence

motion on January 30, 2019, following his jury trial convictions for first-degree

murder,[1] robbery-inflicting serious bodily injury,[2] burglary,[3] carrying a firearm

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. § 2502.

[2] 18 Pa.C.S.A. § 3701(a).

[3] 18 Pa.C.S.A. § 3502(a).

without a license,[4] carrying a firearm on public streets or public property in Philadelphia,[5] and possession of an instrument of a crime.[6] We affirm.

The trial court accurately summarized the relevant facts of this case as follows.

> During the early morning hours of August 24, 2009, [Appellant] broke into the home of Akia Harris, at 2591 Shields Street in Philadelphia[, Pennsylvania], where [] Kamara Joseph [("Joseph")] was sleeping on the couch. [Appellant] pistol whipped [Joseph], duct taped his wrists and ankles behind his back[,] duct taped his face, and began to strangle [Joseph] with a shoe string. [Appellant] then shot [Joseph] in the head once with a revolver. After stealing a few items from the home, [Appellant] fled the premises. [Akia] Harris, who was not home the night of the murder, returned home the afternoon of August 24[, 2009] and discovered [Joseph's] body.
>
> There were no witnesses to the murder and for almost seven years[,] the case remained unsolved. On February 1, 2016, [Appellant] made a [telephone] call to the [Federal Bureau of Investigation ("FBI")] in Delaware and subsequently confessed to the murder of [Joseph], as well as the double murder of Nakeisha Finks [("Finks")] and Jonathan Pitts [("Pitts")], both of whom were also duct taped before being shot in the head with a revolver. [Thereafter, the Commonwealth criminally charged Appellant.]

Trial Court Opinion, 5/14/19, at 1-2 (internal citations omitted).

On January 10, 2018, Appellant filed a motion to suppress, in which he sought to suppress his confession. Appellant argued that mental deficiencies

---

[4] 18 Pa.C.S.A. § 6106(a).

[5] 18 Pa.C.S.A. § 6108.

[6] 18 Pa.C.S.A. § 907(a).

prevented him from executing a valid waiver of his *Miranda*[7] rights and, as such, law enforcement obtained his confession in violation of the Fourth, Fifth, Sixth and Fourteenth Amendments of the United States Constitution as well as Article I, Section 9 of Pennsylvania's Constitution. Appellant's Motion to Suppress, 1/10/18, at *1-5 (un-paginated). The trial court heard evidence regarding suppression on April 9, 2018, April 13, 2018 and April 18, 2018. Thereafter, on June 11, 2018, the trial court denied Appellant's motion and concluded that Appellant "gave his various statements to authorities knowingly, intelligently, and voluntarily." N.T. Hearing, 6/11/18, at 20.

Appellant's jury trial commenced September 24, 2018. The Commonwealth introduced the video recording of Appellant's confession during trial. *See* N.T. Trial, 9/25/18, at 165; *see also* Trial Court Opinion, 5/14/18, at 2. In addition, the Commonwealth introduced various crime scene photographs during trial which depicted Joseph, Finks, and Pitts bound and gagged, as well as their gunshot wounds. *See* N.T. Trial, 9/25/18, at 141-144 and 155-157.

On October 1, 2018,[8] the jury found Appellant guilty of the aforementioned crimes. That same day, the trial court sentenced Appellant to a mandatory term of life imprisonment without the possibility of parole for

---

[7] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[8] The notes of testimony erroneously indicate that the jury found Appellant guilty of the aforementioned crimes and the trial court sentenced Appellant on November 1, 2018.

the charge of first-degree murder. N.T. Trial, 10/1/18, at 33. For Appellant's other charges, the trial court sentenced him to an aggregate term of 28½ to 57 years' incarceration. *Id.* at 35. The court ordered that this sentence run concurrently to Appellant's life sentence. *Id.* Appellant filed a post-sentence motion on October 10, 2018, which the trial court denied on January 30, 2019. This timely appeal followed.[9]

Appellant raises the following issues on appeal:

I.  Did the trial court commit reversible error by denying [A]ppellant's [m]otion to [s]uppress [s]tatements [and] ruling that such statements were given knowingly, intelligently, and voluntarily[?]

II. Did the trial court commit reversible error, despite [its] cautionary instruction, by allowing the Commonwealth to introduce into evidence and otherwise display numerous . . . inflammatory, graphic, cumulative, and irrelevant [photographs?]

III. Did the trial court commit reversible error by denying [A]ppellant's [m]otion for [j]udgment of [a]cquittal [when the Commonwealth failed to present sufficient evidence to sustain Appellant's convictions for carrying a firearm without a license and carrying a firearm on public streets or public property in Philadelphia?]

Appellant's Brief at 4-5.

---

[9] Appellant filed a notice of appeal on February 27, 2019. On March 8, 2019, the trial court entered an order directing Appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b)(1). Appellant timely complied. The trial court issued an opinion pursuant to Pa.R.A.P. 1925(a) on May 14, 2019.

In his first issue, Appellant argues that the trial court erred in denying his motion to suppress.[10]  Specifically, Appellant asserts that his confession should have been suppressed because of his "negating mental deficits" prevented him from knowingly, intelligently, and voluntarily waiving his *Miranda* rights.  Appellant's Brief at 8.  We disagree.

With respect to an appeal from the denial of a motion to suppress, our Supreme Court has stated the following:

> Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct.  When reviewing the ruling of a suppression court, we must consider only the evidence of the prosecution and so much of the evidence of the defense as remains un[-]contradicted when read in the context of the record. …  Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

*Commonwealth v. Eichinger*, 915 A.2d 1122, 1134 (Pa. 2007) (citations omitted).  "It is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given their

---

[10] The Commonwealth argues that Appellant "waived his challenge to the suppression court's denial of his motion" because he failed to include the "complete transcripts from the suppression motion in the certified record." Commonwealth's Brief at 9.  In general, "[a]n appellant's failure to provide the reviewing court with a complete certified record results in the waiver of the claim." *Commonwealth v. Little*, 879 A.2d 293, 301 (Pa. Super. 2005). This Court, however, obtained the transcripts from the hearings conducted on April 9, 2018, April 18, 2018, and June 11, 2018.  In addition, we analyzed the exhibits entered into evidence during the various proceedings. Accordingly, Appellant's omission did not hamper our review and, as such, we will address the merits of his claim.

testimony." ***Commonwealth v. Gallagher***, 896 A.2d 583, 585 (Pa. Super. 2006). Moreover, our scope of review from a suppression ruling is limited to the evidentiary record that was created at the suppression hearing. ***In re L.J.***, 79 A.3d 1073, 1087 (Pa. 2013).

It is well settled that the police must administer ***Miranda*** warnings to all individuals subjected to custodial interrogation.

> It is a fundamental precept of constitutional law that a suspect subject to a custodial interrogation by police must be warned that he has the right to remain silent, that anything he says may be used against him in court, and that he is entitled to the presence of an attorney. ***Miranda***, 384 U.S. at 469. If an individual is not advised of those rights prior to a custodial interrogation, any evidence obtained through the interrogation is inadmissible at trial. ***In re K.Q.M.***, 873 A.2d 752, 755 (Pa. Super. 2005). The ***Miranda*** safeguards are triggered "whenever a person in custody is subjected to either express questioning or its functional equivalent." ***Rhode Island v. Innis***, 446 U.S. 291, 292 (1980).

***Commonwealth v. Freeman***, 128 A.3d 1231, 1240 (Pa. Super. 2015) (parallel citations omitted).

A defendant, however, "may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." ***Miranda***, 384 U.S. at 444. Notably, our Supreme Court has repeatedly held that "'there is no *per se* rule that a defendant's waiver of his constitutional rights is defective merely because his mental illness distorts [the] defendant's perceptions of reality.'" ***Commonwealth v. Mitchell***, 105 A.3d 1257, 1267 (Pa. 2014) (citation omitted). Rather,

> [t]he voluntariness standard of ***Miranda*** requires that the prosecution prove by a preponderance of the evidence that the

waiver is knowing and intelligent. This requires a two-step analysis. First, the waiver must have been voluntary in the sense that it was an intentional choice made without any undue governmental pressure; and, second, that the waiver must have been made with a full comprehension of both the nature of the right being abandoned and the consequences of that choice. [**Commonwealth v. Logan**, 549 A.2d 531, 537 (Pa. 1988) (citation omitted).]

Thus, in the suppression realm, the focus is upon police conduct and whether a knowing, intelligent and voluntary waiver was effected based on a totality of the circumstances, which may include consideration of a defendant's mental . . . condition[.] **Commonwealth v. Cox**, 686 A.2d 1279, 1287 (Pa. 1996). When a defendant alleges that his waiver or confession was involuntary, the question is not whether the defendant would have confessed without interrogation, but whether the interrogation was so manipulative or coercive that it deprived the defendant of his ability to make a free and unconstrained decision to confess. [**Commonwealth v. Sepulveda**, 55 A.3d 1108, 1136-1137 (Pa. 2012 (quotation marks and quotations omitted).]

**Id**. at 1268 (parallel citations omitted).

During a hearing conducted on June 11, 2018, the trial court stated its findings of fact with regard to the various suppression hearings.

[One:] On February 1, 2016, [Appellant] . . . a long time Philadelphia, [Pennsylvania] resident, was living with his mother[,] Barbara Barrow[,] in Wilmington, Delaware.

Two: [Appellant] on February 1, 2016 contacted the FBI office in Delaware and advised the call taker that he wanted to confess to various crimes, including robbery and homicide.

Three: The FBI call taker obtained contact information from [Appellant] and advised him that someone would follow up.

Four: FBI Special Agent Scott Duffy returned [Appellant's] call on the very same day, and [Appellant] advised him that he wanted to talk to authorities about some robberies committed in Philadelphia. The agent arranged to meet [Appellant] on February 3, 2016.

Five: FBI Agent Duffy then reached out to Police Officer John Benham[,] . . . a Philadelphia police officer assigned to the FBI. In addition, Detective Dan Gruzzi[,] . . . a Delaware State agent[,] was [ ] enlisted in this effort.

Six: On February 3, 2016, Duffy and Gruzzi went out to meet [Appellant] at a community center selected by [Appellant as Appellant] informed Agent Duffy that he did not want police coming to his home to interview him.

Seven: Upon arrival at the pre-arranged location, [Appellant] approached the agents' car and the men introduced themselves to each other. [Appellant] then voluntarily entered the car and the men drove to a Delaware State police station.

Eight: Agent Duffy, in response to a question from the prosecutor while on direct examination, advised this court that [Appellant] was not under arrest and the men only made small talk *en route* to the police station.

Nine: Upon arrival at the Delaware police station, the men then entered an interior room. And from that point on, the conversation was videotaped. There was more small talk including [Appellant] showing his various tattoos to the law enforcement agents.

Ten: At that point the law enforcement agent stated: So you want to tell on yourself -- that's unusual. You are not under arrest, but I'm going to give you your [**Miranda**] warnings. Thereafter, the standard warnings were read to [Appellant.]

[11]: The defendant then waived his right to have a lawyer present, and signed the form under the words Waiver of Rights, [which was] also read to him[.] And that document was marked as Commonwealth Exhibit [four]. Thereafter, [Appellant] engaged in a conversation with [the] law enforcement agent[s] during which time he admitted to the perpetration of various criminal offenses in Philadelphia, including [various] robberies[.]

[12]: It should be noted that, as clear from the video, [Appellant] was not subjected to any physical or emotional coercion. In addition he was fed, given bathroom breaks and provided cigarettes. Also, [Appellant] was not under the influence of either drugs or alcohol.

[13]: Thereafter, following a break, [Appellant] continued his conversation with the law enforcement agents and told them about two homicides. One where a single black male was killed by him. And [a] second wherein he killed two people, a black male and a black female. Despite [the defense's] contention[] that [Appellant] was [led to confess] by voices, he, during the course of this audio proceeding never mentioned hearing voices.

[14]: [Appellant] was then moved across the hall to another room in the same building, and thereafter Police Officer John Benham questioned him about the two homicides.

[15]: Police Officer John Benham stated he was an officer assigned to the Homicide Unit working with an FBI joint task force. He stated he had been asked to research the various crimes [Appellant] had confessed to committing.

[16]: Upon his arrival at the Delaware police station, Benham entered the room and commenced an interview with [Appellant] with the following words:

First question: Did they read you your rights? [Appellant] answered yes. Did you understand them? [Appellant] answered yes.

[17]: Police Officer Benham then proceeded to interview [Appellant] on video first about the robberies, then the homicide.

[18]: Police Officer Benham asked [Appellant] if he was willing to go to Philadelphia for a follow-up interview because he, Benham, knew very little, if anything, about the two homicide cases. Yet he continued to interview -- continued his interview with [Appellant] -- until Homicide Detectives Tim Bass and George Pirrone . . . arrived.

[19]: After introducing [Appellant] to the homicide detectives, Police Officer Benham was finished with his involvement, and [Appellant] agreed to return to Philadelphia with the detectives.

[20]: On February 4, 2016 at or about 5:00 a.m., Homicide Detective Gregory Santamala interviewed [Appellant] inside [the] police homicide unit. Santamala was the initial assigned detective in the instant case, to wit [the] homicide of Kamara Joseph committed on August 24, 2009 in the 2500 block of Shield Street [Philadelphia, Pennsylvania.]

- 9 -

[21]: Detective Santamala read [Appellant] his **Miranda** warnings and asked if he understood them. After [Appellant] stated yes, he signed the waiver form marked in this courtroom as Commonwealth's Exhibit [eight]. The Court finds there was no coercion or intimidation.

[22]: [Appellant] gave a videotaped statement admitting to the homicide of [Joseph]. A written summary of the admission was prepared and read to [Appellant] on the videotape by Detective Robert Hesser . . .[the summary of] which [Appellant] adopted.

[23]: Thereafter, [Appellant] was interviewed by the detectives assigned in the homicide of the two victims[, Pitts and Finks.] Detective Joseph Bamberski, who first met [Appellant] inside the homicide unit on [February 4, 2016] at 5:00 p.m., was the assigned [detective] in that investigation. There was a break and the statement resumed at 7:00 p.m. That case is not part of the trial now before this [c]ourt.

[24]: Nevertheless, Detective Bamberski read [Appellant] his **Miranda** rights. And after [Appellant] stated he understood them, he was asked to sign the waiver part, and he did so. [Appellant] then gave a videotaped confession outlining how he killed the victims in the double homicide case.

[25]: On February 4, 2016, the aforementioned Officer Benham, returned to Philadelphia and met with [Appellant] again in the homicide unit. He stated he wanted to question [Appellant] in his capacity as a member of the joint task force about the various robberies which he thought might be federalized.

[26]: He gave [Appellant] **Miranda** warnings by reading them to him from the standard waiver card. After being warned of his rights, [Appellant] stated he understood them and signed the waiver card, evidencing same.

[27]: Thereafter, Officer Benham took an interview which was videotaped. However, he learned that Southwest Detectives Division had taken over the homicide investigation.

[28]: Thereafter, Detectives Conway and Daly interviewed [Appellant] on video about the robberies. Those crimes are not part of this trial.

[29]: During the course of the testimony on the motion, reference was made to a chronology prepared by police investigators which

included time and place of the warnings and waivers. [Appellant] never asked for a lawyer or to stop any of the interviews. Further, the chronology reflects that [Appellant] was fed, given breaks, food and cigarettes, and that he slept inside the interview room.

[30]: In addition, none of the police personnel ever stated that [Appellant] told them he heard voices or that voices told him to confess to any of the crimes at issue. … In fact, neither of the expert witnesses who later testified in this case stated that [Appellant] told them he heard voices. The only witness in these proceedings who stated [Appellant] told her he heard voices was his mother.

[31]: At the conclusion of the Commonwealth's case in chief[,] [Appellant] called a neuropsychologist, [Dr.] Carol Armstrong, as an expert witness.

[32]: [Dr.] Armstrong testified to her evaluation of [Appellant] which included, among other things, a review of his medical records and an assessment interview wherein various psychological tests were administered.

[33]: [Dr.] Armstrong found that [Appellant] had a number of mental deficiencies; that he carried a diagnosis of Unspecified Schizophrenia Spectrum and other psychotic disorders, with an IQ of 75 which she characterized as Intellectual Disability.

[34]: It was [Dr.] Armstrong's opinion that [Appellant's] constellation of mental impairments rendered him incapable of knowingly, intelligently and voluntarily waiving his *Miranda* rights.

[35]: On rebuttal the Commonwealth called its expert witness; one [Dr.] Kirk Heilbrun. . . a forensic psychologist.

[36]: [Dr.] Heilbrun also performed an evaluation which consisted of an interview with [Appellant], review of medical records and the administration of various psychological tests.

[37]: [Dr. Heilbrun] determined that [Appellant], although he had underlying psychological deficiencies with an IQ of 75, should be characterized not as Disabled but as Borderline.

[38]: [Dr. Heilbrun's] opinion, including findings on the *Miranda* Rights Comprehension Instrument -- hereafter referred to as MRCI -- was that [Appellant] had sufficient ability to understand

and appreciate the **Miranda** warnings and to meaningfully waive [the] same.

N.T. Hearing, 6/11/18, at 6-17. Based upon the aforementioned findings of fact, the trial court concluded that Appellant "gave his various statements to authorities knowingly, intelligently and voluntarily." **Id.** at 20. Upon review, we agree with the trial court's determination that, based upon the totality of the circumstances, suppression was unwarranted.

Herein, the Commonwealth demonstrated that law enforcement did not coerce or threaten Appellant in order to obtain his confession. To the contrary, Appellant, himself, "reached out to law enforcement authorities, and once **Mirandized** told them things . . . about this homicide and other crimes that could only have been known by the perpetrator, the victim, and/or the investigators." N.T. Hearing, 6/11/18, at 18. Moreover, during interrogation, Appellant "was not denied any of the comforts he requested." N.T. Hearing, 4/18/18, at 198. The evidence showed that Appellant slept for "approximately 14 hours," and that police gave him "pizza," "Chinese [food], pastries, water, [and] soda," as well as cigarettes whenever Appellant requested. **Id.** Thus, there is no evidence that Appellant made his confession as a result of any undue governmental pressure.

Similarly, we conclude that Appellant was aware of "both the nature of the right being abandoned and the consequences of that choice." **Logan**, 549 A.2d at 537. As the Commonwealth pointed out, Appellant has had multiple interactions with the criminal justice system. Indeed, Appellant was arrested

"ten or more" times, entered "four guilty pleas," received three guilty verdicts after trials, and attended multiple probation violation hearings. N.T. Hearing, 4/18/18, at 196. In addition, Appellant's responses in the administration of the MRCI further demonstrate his knowledge of the nature of his **Miranda** rights. As the trial court explained,

> [t]he following are questions put to [Appellant] and his responses in administration of the MRCI.
>
> Question: What do[es] you have the right to remain silent and do not have to say anything mean?
>
> Answer: It means you don't have to agree to anything, say anything, don't have to cooperate.
>
> Question: What is meant by anything you say can and will be used against you in the court of law?
>
> [Answer:] It means if you tell us you've done something, we're going to use your statement against you and put you in prison.
>
> Question: What is meant by you have the right to talk to a lawyer of your choice before we ask you questions and also to have a lawyer here with you the whole time we ask questions?
>
> [Answer:] That means you should get an attorney. You have the right to get an attorney if you would like to have one. You don't have to be interrogated without a lawyer present.
>
> Question: What is meant by if you cannot hire a lawyer and you want one, we will see that you have one provided to you free of charge before we ask you any questions?
>
> [Answer:] It means we're going to get you an attorney. If you don't have money, the court system gonna [*sic*] give you a lawyer.
>
> Question: What is meant by if you're willing to give us a statement, you have a right to stop any time you wish?

- 13 -

> [Answer:] It means I could have stopped whenever I wanted to.

N.T. Hearing, 6/11/18 at 18-20. Thus, Appellant clearly understood the nature of the rights being abandoned. Appellant also understood that the "consequence[] of his decision would be jail time [as] he [repeatedly] attempted to bargain for federal prison as opposed to state prison." *Id.* at 20. Based upon all of the foregoing, we conclude that Appellant knowingly, intelligently, and voluntarily made inculpatory statements to police. Accordingly, the trial court did not err in denying suppression.

In his second issue, Appellant claims that the trial court erred in admitting various photographs of Joseph, as well as Finks and Pitts, into evidence during his trial. Appellant's Brief at 16-19. As our Supreme Court previously explained:

> The admissibility of photographs falls within the discretion of the trial court and only an abuse of that discretion will constitute reversible error. *See Commonwealth v. Freeman*, 827 A.2d 385, 405 (Pa. 2003), *citing Commonwealth v. Baez*, 720 A.2d 711, 726 (Pa. 1998), *cert. denied*, 528 U.S. 827 (1999).
>
> The test for determining whether photographs are admissible involves a two-step analysis. "First, the court must decide whether a photograph is inflammatory by its very nature. If the photograph is deemed inflammatory, the court must determine whether the essential evidentiary value of the photograph outweighs the likelihood that the photograph will improperly inflame the minds and passions of the jury." *Baez*, 720 A.2d at 726, *citing Commonwealth v. Marshall*, 643 A.2d 1070, 1075 (Pa. 1994).

*Commonwealth v. Malloy*, 856 A.2d 767, 776 (Pa. 2004) (parallel citations omitted).

- 14 -

In this matter, the Commonwealth proffered photographs of Joseph, Finks, and Pitts, which were taken at both crimes scenes. N.T. Trial, 9/25/18, at 141-144 and 155-157. The trial court admitted these photographs over Appellant's objection. *Id.* at 6-31. On appeal, Appellant argues that admission of the photographs was an abuse of discretion because, according to Appellant, the photographs were "inflammatory, graphic, [and] cumulative." Appellant's Brief at 16. Specifically, Appellant argues that the admission of several photographs depicting "three separate bound, gagged, and bloodied dead bodies," is inflammatory and likely invoked the jury's compassion and sympathy. *Id.* Furthermore, Appellant argues that he "offered to stipulate that 'three people were shot and killed.'" *Id.* at 17-18 (citation omitted). Therefore, Appellant believes that the photographs were irrelevant and unnecessary. *Id.*

We find no abuse of discretion in the trial court's admission of the photographs. As the trial court explained, "the photographs were not inflammatory." Trial Court Opinion, 5/14/19, at 8. Indeed, the "majority of the photographs featured very little blood, and those that did feature blood[,] were displayed in black and white instead of color." *Id.* Moreover, the photographs were not irrelevant. In fact, the photographs "provided essential evidentiary value" as they "show[ed] the nature of [Joseph's] wounds and [assisted] the jury [in] understanding the testimony [of] the assigned detectives and the forensic pathologist." *Id.* Furthermore, despite concluding

that the photographs were not inflammatory, the trial court issued a cautionary instruction to the jury. The court stated:

> Ladies and gentlemen, the photographs you see now and other photographs of [Joseph] are admitted into evidence for the purpose of showing the nature of the wounds he received as well as the conditions at the scene upon the arrival of the police officers, family members and other investigators.
>
> They are also admitted to help you understand the testimony of the various witnesses who refer to them.
>
> This photograph and the series of photographs to which I address are not pleasant to look at, but you should not allow them to stir up your emotions to the prejudice of [Appellant].
>
> Your verdict must be based on a rational and fair consideration of all of the evidence and not on passion or prejudice against [Appellant,] against the Commonwealth or anyone else connected to this case.

N.T. Trial, 9/25/18, at 96-97. We therefore conclude that Appellant's appeal of the admission of the photographs is without merit.

Appellant's final claim challenges the sufficiency of the evidence to support his convictions for carrying a firearm without a license as well as carrying a firearm on public streets or public property in Philadelphia. These claims are completely undeveloped and are, thus, waived. *Commonwealth v. Spotz*, 18 A.3d 244, 324 (Pa. 2011). Further, and in the alternative, we conclude that Appellant's sufficiency claims fail, as the claims are meritless. *See Commonwealth v. Markman*, 916 A.2d 586, 606 (Pa. 2007) ("[w]here a decision rests on two or more grounds equally valid, none may be relegated to the inferior status of obiter dictum"), *quoting Commonwealth ex rel. Fox*

***v. Swing***, 186 A.2d 24, 26 (Pa. 1962); ***see also Commonwealth v. Reed***, 971 A.2d 1216, 1220 (Pa. 2009) (where Superior Court determined that appellant's claims were both waived and meritless, the merits-based decision "was a valid holding [and] constitutes the law of the case").

We review Appellant's sufficiency of the evidence challenges under the following standard:

> The standard we apply in reviewing the sufficiency of evidence is whether, viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact[-]finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for that of the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth may not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

***Commonwealth v. Lambert***, 795 A.2d 1010, 1014–1015 (Pa. Super. 2002) (citations omitted).

Appellant's sufficiency claims require little discussion. Appellant first argues that the evidence was insufficient to support his conviction under 18 Pa.C.S.A. § 6106(a)(1). According to Appellant, because the firearm was not

produced during trial, "the Commonwealth did not prove the barrel length to qualify as a firearm." Trial Court Opinion, 5/14/19, at 10; *see also* Appellant's Brief at 20-21. This claim fails.

In relevant part, section 6106(a)(1) provides:

... any person who carries a firearm in any vehicle or any person who carries a firearm concealed on or about his person, except in his place of abode or fixed place of business, without a valid and lawfully issued license under this chapter commits a felony of the third degree.

18 Pa.C.S.A. § 6106(a)(1).

For purposes of Section 6106, a "firearm" is defined as:

Any pistol or revolver with a barrel length less than 15 inches, any shotgun with a barrel length less than 18 inches or any rifle with a barrel length less than 16 inches, or any pistol, revolver, rifle or shotgun with an overall length of less than 26 inches. The barrel length of a firearm shall be determined by measuring from the muzzle of the barrel to the face of the closed action, bolt or cylinder, whichever is applicable.

18 Pa.C.S.A. § 6102.

Contrary to Appellant's claims, the Commonwealth did present sufficient evidence to sustain his conviction under Section 6106(a)(1). Indeed, the Commonwealth introduced into evidence the video-recording of Appellant's confession, in which he stated that, in committing the murder of Joseph, he used a revolver. N.T. Trial, 9/25/18, at 165 and 192. Moreover, Officer John Cannon of the Philadelphia Police Department testified during Appellant's trial as an expert in firearms identification and comparison. *Id.* at 117-150. During his testimony, he showed two firearms to the jury, a revolver and a

semi-automatic handgun, and explained the difference between the two. *Id.* at 124-133. Officer Cannon testified that, even without recovering the actual murder weapon, it was his opinion that a revolver was used during the incident. *Id.* at 145. He came to this conclusion by analyzing the type of bullet recovered from Joseph's head. *Id.* at 143-146. Accordingly, even without producing the firearm at Appellant's trial, the Commonwealth presented sufficient evidence to sustain his conviction for a violation of Section 6106(a)(1).

Next, Appellant argues that the Commonwealth failed to prove that he violated Section 6108. Appellant argues that the Commonwealth did not show that he carried the firearm "in a vehicle or concealed it on or about his person" and, as such, did not present sufficient evidence to sustain his conviction for a violation of Section 6108. Trial Court Opinion, 5/14/19, at 10; *see also* Appellant's Brief at 20-21. This claim also lacks merit.

The offense of carrying firearms on public streets or public property in Philadelphia, 18 Pa.C.S.A. § 6108, provides:

> No person shall carry a firearm, rifle or shotgun at any time upon the public streets or upon any public property in a city of the first class unless:
>
> (1) such person is licensed to carry a firearm; or
>
> (2) such person is exempt from licensing under section 6106(b) of this title (relating to firearms not to be carried without a license).

18 Pa.C.S.A. § 6108.

Herein, in addressing this issue, the trial court concluded:

With regards to concealment, [Appellant] used both his hands to open the window to get into the house, necessitating the firearm's concealment while he entered the premises. N.T. [Trial,] 9/25/[18], at 183-187. [Thus,] the jury was free to infer that the firearm was concealed as [Appellant] made his way to [] Harris's home. Therefore, the Commonwealth met its burden[.]

Trial Court Opinion, 5/14/19, at 11. When viewing the evidence presented in the light most favorable to the Commonwealth, we agree with the trial court and conclude that the evidence presented was sufficient to convict Appellant under Section 6108.

Because Appellant is not entitled to relief for any of his claims, we affirm Appellant's judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/28/20